This is an appeal from a summary judgment for defendants WZEW-FM and Richard *Page 650 
E. Oppenheimer and against plaintiff Sheila McIsaac on her claims of tort of outrage and invasion of privacy. We affirm.
McIsaac sued her employer, WZEW-FM Corporation (the operator of a radio station) in February 1984, claiming that it had breached her employment contract.[1] On May 9, 1985, McIsaac filed an amended complaint, adding Richard E. Oppenheimer as a defendant and adding two causes of action to the complaint; namely, intentional infliction of emotional distress, also known as the tort of outrage, and invasion of privacy. McIsaac appeals, claiming the trial court erred when it granted WZEW's and Oppenheimer's summary judgment on the two tort claims.
Viewed most favorably to plaintiff McIsaac, the supporting depositions tended to show the following: McIsaac began working for WZEW on April 15, 1983, selling advertising to companies in and around Mobile. She was the top sales person at WZEW from April to December of 1983.
In October 1983, Oppenheimer, the principal owner and president of WZEW, took McIsaac to lunch. At lunch, Oppenheimer told McIsaac about an affair that he had had with another female employee and that he wanted to have an affair with someone that could keep her mouth shut. He asked McIsaac to have dinner with him and expressed his desire for McIsaac to be available for him when he was in town. McIsaac testified, "I don't remember exactly what his words were but he was in that fashion asking me to have an affair with him." McIsaac refused his advances, making it clear that she did not want that kind of relationship with him. After lunch, McIsaac took Oppenheimer to the airport, at his request. At the airport, Oppenheimer tried to kiss McIsaac, but McIsaac thwarted his efforts.
Two to three weeks later, Oppenheimer returned to the Mobile station. McIsaac was at the station's copy machine when Oppenheimer walked in and, in McIsaac's words, gave her "a look that you don't normally get from just through your everyday association with your boss." She went to her office, and Oppenheimer came by and asked to speak to her in the conference room. She went to the conference room and stood on the opposite side of the table. Oppenheimer asked her to come to him; McIsaac did not comply. He then asked her if she was going to have dinner with him that evening, to which she said no, stating that she did not want to become that friendly and that she was not open to having an affair with anyone.
Oppenheimer subsequently called her, informing her that he would be coming back to town and that he would arrange a trip for McIsaac to visit him in Texas. With regard to other offensive advances allegedly made by Oppenheimer, McIsaac stated:
 "There were several incidences that I would qualify as suggestive lurks or little innuendoes. . . . I mean I can't tell you specific times and dates of the way that he would look at me or smile at me or wink at me or touch me, just like touch me on my arm or put his arm around me or something like that."
In December 1983, McIsaac found out that WZEW was for sale. She discussed the impending sale with the station manager, Dick Downes, and expressed her concern about becoming unemployed as a result of the sale. Downes suggested that she look for other employment, and he offered to call around for her.
Around the middle of January 1984, McIsaac was informed by Downes that she was going to be fired. McIsaac testified that Downes told her that Oppenheimer had been putting pressure on him to dismiss her, the reason being that she had refused Oppenheimer's advances.
Oppenheimer flatly denies McIsaac's allegations that Oppenheimer made personal *Page 651 
advances and propositions to McIsaac. Downes denies ever having told McIsaac that the reason she was being fired was that she had rejected Oppenheimer's advances. But, even assuming all of McIsaac's assertions and allegations to be true, we find that, as a matter of law, she has failed to establish any evidence of extreme and outrageous conduct on the part of the defendants, or of a wrongful intrusion by the defendants into her private activities, that would create a genuine issue of material fact so as to withstand a motion for summary judgment.
 TORT OF OUTRAGE
To be actionable under the tort of outrage, the conduct involved must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and . . . be regarded as atrocious and utterly intolerable in a civilized society." American Road Service Co. v. Inmon,394 So.2d 361, 365 (Ala. 1980) (citing Restatement (Second) ofTorts § 46, Comment d., at 73 [1965]). This Court described the tort as:
 "the intentional or reckless tort of outrageous conduct causing severe emotional distress, as proposed by the American Law Institute's Restatement (Second) of Torts § 46 (1948):
 "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."
American Road Service Co. v. Inmon, at 362.
There is no evidence of severe emotional distress. The most that can be said, viewing the evidence most favorable to McIsaac, is that Oppenheimer's behavior extended to "mere insults, indignities, threats [or] annoyances," for which the law will not hold one liable in tort. Restatement (Second) ofTorts § 46, Comment d., (1965); Logan v. Sears, Roebuck Co.,466 So.2d 121 (Ala. 1985). The trial court correctly granted summary judgment on this claim.
 INVASION OF PRIVACY
McIsaac's action for invasion of privacy is premised upon that species of invasion known as a wrongful intrusion into one's private activities. This Court has defined the tort as the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. Phillips v.Smalley Maintenance Services, 435 So.2d 705 (Ala. 1983);Restatement (Second) of Torts § 652B (1977).
In Phillips, this Court upheld liability based on a claim that the defendant employer invaded the privacy of the plaintiff employee. Over a three-month period, the defendant repeatedly interrogated the employee behind "locked doors" about "how often Phillips [the employee] and her husband had sex and what `positions' they used." The intrusive interrogation occurred two or three times a week. On several occasions, the defendant asked whether plaintiff had ever engaged in oral sex. The defendant later "insisted" that she engage in oral sex with him on penalty of losing her job, and he exhibited violent anger when she refused to do so. On one occasion, defendant locked plaintiff in his office, began covering the windows, and insisted that she engage in oral sex with him. The plaintiff managed to escape from his office, but suffered a hit from the defendant "across her bottom" with the back of his hand. As a result of the three-month siege, plaintiff suffered severe mental trauma, including chronic anxiety. She had also contemplated suicide.
In Phillips, we recognized the tort of invasion of privacy in the form described in § 652B, Restatement (Second) of Torts
(1977), commonly referred to as the "intrusion upon seclusion" tort. Comment b. to this section states:
 "The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant *Page 652 
forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns. . . ." (Emphasis added.)
In Phillips, this Court found that the defendant's "intrusive and coercive sexual demands upon Brenda Phillips were such an `examination' into her `private concerns,' that is, improper inquiries into her personal sexual proclivities and personality." In the present case, the alleged intrusion and examination into McIsaac's private concerns fall short of that required to constitute this tort. "Even the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability." Logan v. Sears, Roebuck Co., supra, at 124; W. Prosser, Law of Torts, 54-55 (4th ed. 1971).
Based on the above, we hold that the trial court did not err in granting summary judgment on the claims for outrageous conduct and invasion of privacy.
AFFIRMED.
TORBERT, C.J., and JONES, ADAMS and STEAGALL, JJ., concur.
[1] There were two other related corporations named as defendants. They are not directly interested in this appeal, and all three corporate defendants shall be referred to in this opinion as "WZEW-FM."