**Teryl BREWER, et al., Plaintiffs,**

v.

**PETROLEUM SUPPLIERS,
INC., et al., Defendants.**

**No. CV 96–PT–137–M.**

United States District Court,
N.D. Alabama,
Middle Division.

Nov. 13, 1996.

Philip Earl Miles, Floyd Keener Cusimano & Roberts, Gadsden, AL, for plaintiffs.

Donald R. Rhea, Gina D. Coggin, Rhea Boyd & Rhea, Gadsden, AL, for defendants.

## MEMORANDUM OPINION

PROPST, Senior District Judge.

### INTRODUCTION

This cause comes on to be heard on a motion for summary judgment filed by the defendants Petroleum Suppliers, Inc. ("PSI"), Larry Duvall ("Duvall") and Paul McClendon ("McClendon") on September 16, 1996. In their motion for summary judgment, the defendants contest the claims of the plaintiffs, Teryl Brewer and Daryl Brewer, that the defendants are liable for gender discrimination, sexual harassment and retaliation under Title VII and 42 U.S.C. § 1981(a) and for state law tort claims of assault and battery, outrage and invasion of privacy.

On a motion for summary judgment, the court must assess the proof to ascertain whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes prove the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552–53. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir.1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there exists a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court may consider the offered "pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any ..." in deciding whether to grant. or deny a summary judgment motion. FED. R.CIV.P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992).

Considering the above, this court must examine the evidence to determine the existence of a genuine issue of material fact.

## FACTS

The facts are, of course, discussed most favorably to the plaintiff. They may or may not be the actual facts. They may, however, be supported by the evidence.

PSI hired Teryl Brewer as an accounting clerk and/or bookkeeper in December 1993. During her employment, her duties expanded to include aiding her supervisor, Dennis Dickerson ("Dickerson"), in entering reports into a computer, helping Dickerson with accounts payable and receivables, and related tasks. Ms. Brewer claims that she did not engage in office management at any time, though the defendants dispute this statement. The only performance evaluation of Ms. Brewer before the alleged discriminatory and tortious acts of the defendants was given on March 30, 1994. Then, she received a performance evaluation indicating that she had "average, acceptable performance that meets job requirements."

In July 1994, McClendon, the general manager of PSI, allegedly began to harass Ms. Brewer. During the month, he allegedly touched Ms. Brewer's left breast during a work related discussion and pinched her buttocks. Ms. Brewer states that on August 4, 1994, McClendon pinched her buttocks for a

second time. He purportedly pinched them again on August 10, 1994. Dickerson claims to have witnessed two of these occurrences.[1] On at least one of these occasions, Ms. Brewer allegedly slapped McClendon and told him to stop. Several times during the summer of 1994, McClendon would come to work wearing shorts and allegedly would ask Ms. Brewer if she wanted to see his "bunny." Ms. Brewer states that McClendon had been visiting a tanning bed and had received some sort of body improvement that he regularly asked her if she wished to see.

On October 13, 1994, McClendon allegedly touched Ms. Brewer's left breast. He then acted with the apparent intention of pinching her breasts with a "paper clip pincher." Later, while cleaning out the desk of Dickerson, who PSI had terminated, McClendon found a screw that he presented to Ms. Brewer, asking, "Do you want a screw?" in a manner indicating that he wanted to have sex. When McClendon found some emergency phone numbers in the desk, he allegedly told Ms. Brewer that if she ever passed out on the job, he would roll her into a corner and have his way with her. When she awoke, he stated, she would be "asking for more."

Ms. Brewer states that on October 24, 1994, while holding a fork, McClendon asked her if he could "fork" her. On October 25, he purportedly placed his finger under Ms. Brewer's nose and asked what it smelled like. As he walked away, he scratched his buttocks. Ms. Brewer alleges that this happened on several unspecified occasions, with McClendon scratching either his groin or buttocks immediately after placing his finger under her nose. On October 26, 1994, McClendon allegedly placed his hand in the front pocket of Ms. Brewer's jeans.

At one unspecified time, McClendon purportedly stood over Ms. Brewer with his legs spread apart while she was bending into a small refrigerator. Ms. Brewer also states that occasionally, McClendon approached her from behind and pressed against her.[2]

---

1. Dickerson states that after one of these incidents, he mentioned to Larry Duvall that McClendon was pinching employees on the buttocks and that Duvall needed to do something about it.

2. Ms. Brewer also recounts an incident between Debbie Leeth ("Leeth") and McClendon that occurred in 1992. Allegedly, Leeth was subjected to vulgar comments from McClendon and McClendon purportedly placed a Polaroid cam-

On October 25, 1994, Ms. Brewer and her husband, Daryl Brewer, visited the home of Duvall, the Chief Executive Officer of PSI, to inform him about McClendon's alleged behavior toward Ms. Brewer. However, Duvall claims, he was in a meeting, and was therefore unable to speak with the Brewers. The following day, Duvall called Ms. Brewer at work, but she allegedly felt uncomfortable speaking about the matter over the phone in front of her coworkers. Duvall, apparently oblivious to the alleged source of Ms. Brewer's problems, then asked McClendon to discuss with Ms. Brewer her concerns. The defendants state that when McClendon approached Ms. Brewer, she claimed to be having problems with Jane Sampson, who PSI had hired in July 1994 to assist in bookkeeping. At the time of the discussion, McClendon gave Ms. Brewer an employee warning notice requiring her to improve her performance within two weeks or be terminated.[3] This employee warning came on the heels of an employee performance appraisal given on September 12, 1994, in which Ms. Brewer received a low rating.[4]

Ms. Brewer sent Duvall a certified letter on November 17, 1994, explaining her problems with McClendon. Duvall then phoned Ms. Brewer. During the conversation that followed, Ms. Brewer detailed incidents of McClendon's alleged behavior. Duvall states that after the phone conversation, he asked Ms. Brewer's co-workers about the incidents. The defendants allege that no one in the office could verify the incidents listed by Ms. Brewer, and that they instead informed Duvall of amorous activity between Ms. Brewer and Dickerson.

On November 23, 1994, Duvall telephoned Ms. Brewer at her home and terminated her employment at PSI. Allegedly, Duvall threatened to tell Mr. Brewer and Dickerson's wife that an affair was taking place between Ms. Brewer and Dickerson if Ms. Brewer instigated any form of legal action. Duvall states that he terminated her because of poor job performance stemming from accounting woes in her department and because she could not effectively interact with other employees recently hired to correct the accounting problems created by her and Dickerson.

After her termination, Ms. Brewer applied for and received Social Security disability benefits, beginning on November 11, 1994.

## CONTENTIONS AND ANALYSIS

The defendants contest Ms. Brewer's claims of gender discrimination, sexual harassment and retaliation under Title VII and her state law claims of outrage, assault and battery, and invasion of privacy. The defendants also contest Mr. Brewer's loss of consortium claim, either as the direct result of the invasion of privacy against him or as a derivative consequence of actions taken against Ms. Brewer.

## I. TITLE VII CLAIMS

Under Title VII, Ms. Brewer brings claims against all defendants for gender discrimination in its hiring practices and in providing unequal pay, for sexual harassment and for retaliation.

### A. Finding the proper defendants

■ The defendants argue that McClendon and Duvall are not proper defendants under Title VII, because neither is an "employer" for purposes of the statute. Under Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..."

---

era beneath Leeth's skirt and shot a photograph. Although Leeth complained to Duvall about the incidents, he allegedly took no action against McClendon and instead instructed Dickerson to "get rid of" Leeth. Leeth subsequently resigned from PSI.

3. McClendon states that the warning given was Ms. Brewer's second notice of poor behavior, an earlier one having supposedly been given by Dickerson. However, Dickerson denies having ever given Ms. Brewer a warning about her performance.

4. The defendants claim that the employee performance appraisal of September 12, 1994, was administered by both Dickerson and McClendon. The plaintiffs, and Dickerson, state that the appraisal was written by McClendon, acting alone, and that Dickerson's signature was forged.

42 U.S.C. 2000e(b). The defendants argue that under this definition only PSI is an "employer" for Title VII purposes, not Duvall and McClendon.

The court agrees. In *Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991), the Eleventh Circuit Court of Appeals held that "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." *Id.* at 772. Therefore, both McClendon and Duvall are inappropriate defendants under Title VII.

## B. Disability determinations as a bar to Title VII claims

Next, PSI contends that the awarding of Social Security disability benefits to Ms. Brewer as of November 11, 1994, bars her from recovering under Title VII against PSI. The receipt of these benefits, the defendant argues, causes the damage to Ms. Brewer to be only nominal, as the Social Security Administration determined her to be unable to work at a date before her discharge. Ms. Brewer maintains that, at best, the determination that Ms. Brewer was disabled as of November 11, 1994 prevents her from receiving back pay for the retaliatory discharge. It would not, however, affect her ability to obtain other forms of compensatory relief and punitive damages. Therefore, her retaliation claim is not barred as a whole.

In the cases that discuss the effects of a disability determination by the Social Security Administration suit, attorneys have argued that a determination of disability defeats a *prima facie* case of discrimination. *See McNemar v. Disney Store, Inc.,* 91 F.3d 610, 621 (3d Cir.1996); *Overton v. Reilly,* 977 F.2d 1190, 1196 (7th Cir.1992). In most discrimination claims, the plaintiff is required to show in her *prima facie* case that she was "qualified" for the position or other term,

condition or privilege of employment. It is argued that an individual who is ascertained eligible to receive Social Security disability benefits is not otherwise "qualified," because to receive Social Security disability benefits, she must be incapable of doing the jobs that she was previously able to perform. In some of these cases, the finding of disability has rendered the plaintiff's claims to be "qualified" untenable. *McNemar,* 91 F.3d at 621. In others, the disability determination is to be considered one factor among others in making the determination of "qualification." *Overton,* 977 F.2d at 1196.

 The court agrees with Ms. Brewer that, for the most part, only her retaliation claim is potentially affected by the determination of disability. Under Eleventh Circuit law, however, whether the plaintiff is "qualified" is not pertinent to a retaliation claim. To state a *prima facie* case of retaliation,

> ... the plaintiff must show (1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities.

*Coutu v. Martin County Bd. of Comm'rs,* 47 F.3d 1068, 1074 (11th Cir.1995). It is irrelevant to the retaliation claim that the plaintiff can prove an underlying claim of discrimination. *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1021 (11th Cir.1994). The purpose of the retaliation claim is to prevent employers from retaliating against employees who raise Title VII claims, whether those claims will eventually be found meritorious or not. *Id.* Therefore, whether the plaintiff is disabled and, hence, "unqualified," is unrelated to whether she was retaliated against by PSI.[5]

## C. Sexual harassment claims

Ms. Brewer claims to have been the subject of both quid pro quo and hostile environ-

---

[5] Any events or actions taken prior to November 11, 1994, that are subjects of discrimination claims are not barred, as the Social Security Administration had not found Ms. Brewer disabled before that date. However, any discrimination (not harassment) claims arising from events on or after November 11, 1994 will be dismissed, as this court doubts that an individual can be adjudged both incapable of performing her present work and minimally qualified to perform that work. The court does conclude that such damages as backpay would be inappropriate in this case, as the plaintiff would not, in theory, have been entitled to a salary after the date of her disability.

ment sexual harassment. PSI disputes its liability under both claims.

### 1. Quid pro quo sexual harassment

■ "Quid pro quo sexual harassment occurs when an employer changes an employee's conditions of employment because of their (*sic*) refusal to submit to sexual demands." *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1362 (11th Cir.1994) (*citing Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989)). Additionally, "an employer is strictly liable for quid pro quo sexual harassment." *Faragher v. Boca Raton*, 76 F.3d 1155, 1163. PSI argues that Ms. Brewer cannot prove quid pro quo sexual harassment because "McClendon's sexual advancements were not directed toward 'affecting her employment status.' *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559 (11th Cir.1987)." Instead, it contends, the poor evaluation of Ms. Brewer's performance by McClendon and, purportedly, Dickerson, and McClendon's warning that Ms. Brewer would be fired in two weeks if her performance did not improve were the result of Ms. Brewer's poor performance at work.

Ms. Brewer contends, instead, that the warning came within days after the Brewers visited Larry Duvall's home, indicating that McClendon suspected the reason that Ms. Brewer went to Duvall and retaliated against her. In addition, if the date on the unsigned evaluation is to be believed, arguably the poor evaluation came in response to Ms. Brewer's unwillingness to accede to McClendon's alleged advances. Finally, Ms. Brewer argues, McClendon's accusations that Ms. Brewer was the source of PSI's accounting woes came after the plaintiffs' complaints became known.

■ To prove a *prima facie* case of quid pro quo sexual harassment, the employee must prove:

(1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or

terms, conditions or privileges of employment.

*Virgo*, 30 F.3d at 1361. It is relatively undisputed that, for purposes of summary judgment, Ms. Brewer satisfies the first three criteria. At issue is whether "the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment." *Id.* In the standard case of quid pro quo sexual harassment, a supervisor overtly demands sexual favors in exchange for either positively altering the employee's status or not downgrading the employee's status. However, quid pro quo sexual harassment can also occur when the harasser tacitly demands sexual gratuities by altering the status of an employee when his advances are spurned. *See Sparks v. Regional Medical Center Bd.*, 792 F.Supp. 735, 746 (N.D.Ala.1992). PSI argues that Ms. Brewer has not established that her reaction to McClendon's alleged behavior affected a term, condition, or privilege of employment. However, that the unfavorable reports about Ms. Brewer came shortly after her responding to McClendon's alleged harassment of her is sufficient evidence upon which a jury may find that Ms. Brewer's responses to McClendon resulted in unfavorable reviews and eventual termination.

### 2. Hostile work environment sexual harassment

The defendants do not argue, other than to assert that Ms. Brewer's allegations concerning McClendon are false, that she was not exposed to a hostile work environment. Instead, they argue, Ms. Brewer cannot maintain a claim for hostile work environment sexual harassment against PSI because McClendon's alleged actions did not occur within the "line and scope" of his employment relationship with PSI and were not ratified, confirmed or adopted by PSI. Citing *Davis v. Monroe County Bd. of Educ.*, 74 F.3d 1186, 1195 (11th Cir.1996), PSI argues that "whether ... harassing conduct of a supervisor or co-worker should be imputed to the employer is determined in accordance with common-law principles of agency." The defendants point to this court's reasoning in

*Sparks v. Regional Medical Center Bd.,* 792 F.Supp. 735, 748 (N.D.Ala.1992) to support its contention that McClendon was not acting as PSI's agent:

> Under Alabama case law, an employer is liable for the torts of an employee: (1) if the employee was acting within the scope of his employment or (2) if the employer ratified, confirmed, or adopted the unauthorized wrongful conduct of the employee. *Moman v. Gregerson's Foods, Inc.,* 570 So.2d 1215, 1216 (Ala.1990). An employee's conduct is not within the scope of employment if it is "impelled by motives that are wholly personal, or to gratify his own feelings or resentment." *Doe v. Swift,* 570 So.2d 1209, 1211 (Ala.1990). Numerous Alabama cases have held that sexual conduct by an employee is purely personal and outside the line and scope of his employment. *Id.* The court concludes that Garland was not acting within the line and scope of his employment when he allegedly sexually harassed plaintiff and submitted her to unwanted touchings. Such conduct was clearly not within the scope of his employment and was motivated for reasons wholly personal to Garland.[6]

The defendants argue that McClendon's alleged conduct occurred for reasons that were not in any manner work-related and thus, were outside the scope of his employment. In addition, the defendants argue, the behavior of Duvall and PSI in investigating Ms. Brewer's claims was such as to not condone or encourage the behavior of McClendon.

Ms. Brewer responds that under common-law principles of agency, PSI should be held liable for McClendon's behavior. First, PSI's delegation of authority to McClendon allowed him to engage in harassment. Second, some sexual harassment took place in the line of work-related incidents, such as the initial touching of Ms. Brewer's left breast in July. Third, Ms. Brewer states, her immediate termination after raising the harassment claim, in addition to the veiled threats of telling Mr. Brewer that an affair occurred between her and Dickerson and the past

handling of Leeth's encounter with McClendon, is sufficient reason for a jury to find that Duvall, and therefore PSI, tacitly condoned McClendon's alleged behavior.

Ms. Brewer contends that an employer can be held liable for the hostile work environment created by its supervisors not only on an agency theory, but also when the employer knew or should have known of the hostile work environment and took no steps to remedy it. *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503 (11th Cir.1989). In this instance, Ms. Brewer urges, she told Duvall of the hostile work environment and he attempted to remedy it not by ending the harassment, but by firing her and threatening to poison the Brewers' marriage by telling Mr. Brewer of an alleged affair between Ms. Brewer and Dickerson.

PSI responds that Duvall took prompt remedial action in investigating the claim. According to PSI, Duvall's investigation turned up no corroboration of the incidents and it led him to believe that an affair had occurred between Dickerson and Ms. Brewer. He responded to his investigation appropriately, therefore, by firing Ms. Brewer.

■ An employer can be held liable in a hostile work environment case if

> ... either (1) the employer knew or should have known of the harassment and failed to take prompt remedial action, or (2) the harasser acted as the employer's agent. However ..., only in an exceptional case will a harasser act as the employer's agent in creating a hostile work environment.

*Faragher v. City of Boca Raton,* 76 F.3d 1155, 1164 (11th Cir.1996). Whether a harasser acts as an employer's agent involves common law principles, but the common law is not to be drawn from the law of the state in which the harassment occurs. The Eleventh Circuit Court of Appeals has stated that central to the inquiry of whether a harasser acts as an employer's agent is whether the harasser is acting within the scope of employment while harassing the employee. *Id.* at 1166. In *Faragher,* the Court of Appeals

---

6. It should be noted that this discussion does not derive from this court's analysis of the Title VII sexual harassment claims in *Sparks,* but is taken from the court's commentary on Spark's state law claims.

listed several factors to direct this inquiry, such as, "the supervisor's direct authority over the plaintiff, the overall structure of the workplace, and the relative positions of the parties." *Id.* at 1165. However, these factors are not determinative of whether the actions took place within the scope of employment. *Id.* at 1166. An act of harassment by a supervisor who has substantial authority over an employee in a company with little official policy on harassment will still fail to be within the scope of employment if the harassment does not occur as a part of the company's policy for encouraging or discouraging employee behavior, for increasing productivity, or for accomplishing other of the company's goals. There is no indication that McClendon's behavior was pursuant to an attempt to encourage good workplace behavior by Ms. Brewer or to increase her productivity. Indeed, as Ms. Brewer has presented the events, McClendon's alleged behavior seems more aimed at disrupting and interfering with PSI's business goals.

 This does not mean, however, that PSI cannot be held liable if McClendon created a hostile environment. If, as the plaintiff indicates, Duvall failed to remedy a situation of harassment of which he knew, either from discussions with Dickerson or through his conversation with Ms. Brewer, PSI may be liable for a hostile environment. An issue of triable fact remains as to whether Duvall adequately attempted to remedy any alleged harassment.

## II. Alabama Tort Claims

### A. Mr. Brewer's loss of consortium claim

The defendants argue that Daryl Brewer cannot maintain his loss of consortium claim against any of the defendants. First, the defendants argue, Mr. Brewer cannot bootstrap his loss of consortium claim onto Teryl Brewer's Title VII action. The plaintiffs do not contest this, having never included Daryl Brewer in a Title VII claim.

The defendants also argue that because Mr. Brewer's loss of consortium claim is based solely on state law causes of action he therefore has no "standing" to bring this case in federal court. This court will interpret the defendants' concern about "standing" to be one about subject matter jurisdiction, not "standing" in the traditional sense of the word.

 Certainly, standing alone, the court would not have subject matter jurisdiction of Mr. Brewer's claims, as there is neither diversity of citizenship nor a federal question raised. However, Congress has granted the federal courts the authority to assert supplemental jurisdiction over state law claims in some circumstances:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). *See Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 455 (11th Cir. 1996). This supplemental jurisdiction includes state law claims by parties that stem from the same transaction or occurrence on which the federal claim is based. *Palmer v. Hospital Auth. of Randolph County,* 22 F.3d 1559, 1567 (11th Cir.1994). Mr. Brewer's loss of consortium claim arises out of the same alleged acts of the defendants, and will involve substantially the same underlying questions and evidence. Therefore, Mr. Brewer's claims for loss of consortium will not be dismissed for lack of subject matter jurisdiction.

### B. Assault and Battery

The defendant, Larry Duvall, claims that neither he nor PSI can be held liable for the plaintiffs' assault and battery claim against them because Duvall did not touch Ms. Brewer or "lay hands [on her] in a hostile manner." *Surrency v. Harbison,* 489 So.2d 1097,

1104 (Ala.1986).[7] The plaintiffs claim that PSI is liable for the alleged assault and battery by McClendon because PSI participated in, authorized, or ratified the assault and battery. PSI ratified the acts of McClendon, the plaintiffs assert, because after Duvall learned of the pinching of Ms. Brewer from Dickerson he did nothing to correct the problem. Therefore, McClendon was acting as PSI's agent under state law at the time of the assorted pinchings and touchings.

■■■■■ This court agrees with Duvall that he cannot be held liable for the alleged assault and battery of Ms. Brewer. However, this is not the case with respect to PSI.

> For an employer to be held liable for the intentional torts of its agent, the plaintiff must offer evidence (1) that the agent's wrongful acts were committed in the line and scope of employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts...
>
> [To show ratification] ... in addition to proving the underlying tortious conduct of an offending employee, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted ... a tort; and (3) that the employer failed to take "adequate" steps to remedy the situation.·

*Mardis v. Robbins Tire & Rubber Co.,* 669 So.2d 885, 889 (Ala.1995). The plaintiffs have produced sufficient evidence to convince a reasonable trier of fact that Duvall knew of the alleged assault and battery of Ms. Brewer in the form of pinching and touching by McClendon through the reports of Dickerson and Ms. Brewer and that Duvall failed to take adequate remedial steps by not reprimanding McClendon or offering Ms. Brewer

a position away from McClendon, but, instead, terminated her employment.

## C. Outrage

■■■■ The defendants dispute the contention that Alabama law allows a plaintiff to state a cause of action for outrage for sexual harassment of the type alleged. The defendants first state that to prove outrage, the plaintiffs must, "... produce sufficient evidence to show that the Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Nipper v. Variety Wholesalers, Inc.,* 638 So.2d 778, 780 (Ala.1994). Duvall likens the facts in *Nipper* to the facts here. In *Nipper,* the defendants contend, an employer had lost almost $30,000 in inventory and there was some evidence to suggest that the employee caused the loss. Therefore, the employer's investigation of the employee was justified and not so extreme as to constitute outrage. Similarly, Duvall states, his termination of Ms. Brewer was justified based upon the accounting woes in Ms. Duvall's department and Ms. Brewer's poor employee relations skills. Thus, his termination of her, even if improper, was justified.

Next, the defendants point to *McIsaac v. WZEW–FM Corp.,* 495 So.2d 649 (Ala.1986). In *McIsaac,* the defendants state, the Alabama Supreme Court held that the plaintiff could not prove outrage against her supervisor even though the plaintiff was terminated by her employer when she complained of overt sexual advances made toward her by the supervisor. *Id.* at 651.

The plaintiffs respond by directing the court's attention to *Busby v. Truswal Sys. Corp.,* 551 So.2d 322, 323–24 (Ala.1989). In *Busby,* the plaintiffs state, the defendant supervisor gave sexual invitations to the employee, made offensive sexual remarks toward the plaintiffs, expressed sexual fantasies to the plaintiffs and physically accosted the plaintiffs. The actions of the supervisor were so egregious, the plaintiffs argue,

---

**7.** McClendon does not refute the assault and battery claim in the motion for summary judgment.

that the Alabama Supreme Court found that the defendant had committed an outrage. *Id.* at 324. Similarly, the plaintiffs argue, because McClendon pinched Ms. Brewer's buttocks, touched her breasts, expressed a desire to have sex with her if she were ever unconscious, expressed a desire to expose himself to her, pressed against her, and so forth, his behavior was so extreme as to cause outrage.

Generally, this court is loathe to find outrage, and generally believes it to be one of the many "kitchen-sink" claims a plaintiff throws into her complaint to be certain that no claim, however frivolous, is left unmade. The Alabama Supreme Court has suggested, however, that limited forms of sexual harassment do constitute outrage. Mere requests for sexual favors are not sufficient. *McIsaac*, 495 So.2d at 651. Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient. *Id.* However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties. An employee can decline even the most obscene request to be touched in a sexual manner. An employee cannot decline a physical act that has already occurred. At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society. *See generally Busby*, 551 So.2d at 324. If the plaintiff's allegations are true, McClendon has not simply requested or threatened to touch the plaintiff in a sexual manner, he has repeatedly touched her. As such, his actions may constitute outrageous conduct.

 For the reasons stated in the above subsection on assault and battery, PSI may be held liable for a claim of outrage. *See also Mardis*, 669 So.2d at 889–90 (holding that an employee who reports sexual harassment by a supervisor to an employer and is then terminated can recover for outrage against the employer based on the supervi-

sor's tort of outrage). However, Duvall's actions are not such as would render him liable for McClendon's behavior. In addition, his alleged retaliation is solely economic retaliation for reporting the harassment and therefore not so extreme a behavior as to constitute outrage.

### D. Invasion of Privacy

 The defendants argue, first, that McClendon's behavior does not result in an actionable invasion of privacy. At worst, the defendants argue, McClendon invited Ms. Brewer to engage in sexual behavior, but did not make intrusive and coercive sexual demands of the plaintiff. Mere invitations to sexual engagement do not constitute a "... wrongful intrusion into one's private activities in such a manner so as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW–FM*, 495 So.2d at 651.

The plaintiffs respond that the repeated touchings of Ms. Brewer, in addition to the crude remarks and desires expressed to her by McClendon, do constitute an invasion of privacy. She states that in *Potts v. BE & K Const. Co.*, 604 So.2d 398 (Ala.1992), the Alabama Supreme Court observed that continual touching of and lewd comments directed at a plaintiff could constitute an invasion of privacy.[8]

The defendants dispute this and instead argue that the factual allegations in this case more closely mirror those in *McIsaac*, as discussed above. The matter of invasion of privacy is one that is fact sensitive and requires the jury to resolve how keenly the actions of the defendant were an affront to the plaintiff's privacy. Given the facts as viewed most favorably to the plaintiffs, a jury could as equally find the facts in the present case to be like those in *Busby v. Truswal Sys. Corp.*, 551 So.2d at 324 (Ala.1989), as it could find the facts to be like those in *McIsaac*.

 Duvall argues that even if McClendon's acts do constitute an invasion of priva-

8. The court disagrees. In *Potts,* the Alabama Supreme Court did not rule on the issue of invasion of privacy. *Potts* was instead a case

about ratification by an employer of an employee's harassment. *Potts,* 604 So.2d at 399.

cy, his behavior is not actionable. Duvall argues that at no point did he make intrusive inquires into Ms. Brewer's personal, sexual or home habits nor had he attempted to intrude into her home life. At worst, he argues, he threatened to reveal an alleged affair to Mr. Brewer after conducting an investigation among her co-employees. This court agrees. Duvall's behavior is at worst, manipulative, but there is no evidence proving an attempt to spy on the Brewers or to physically intrude upon Ms. Brewer's privacy.

### CONCLUSION

For reasons stated above, all claims against Larry Duvall will be **DISMISSED** and Title VII claims against Paul McClendon will be **DISMISSED**. The motion will otherwise be **DENIED**.