Stephani JOHNSON and Anthony Johnson, Plaintiffs,

v.

WAL–MART STORES, INC., et al., Defendants.

No. CIV.A. 95–M–1645–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 26, 1997.

Melissa C. Bowen, Prattville, AL, for Plaintiff.

Charles A. Powell, III, Spencer A. Kinderman, Johnston, Barton, Proctor & Powell, Birmingham, Al, for Defendant Wal–Mart Stores, Inc.

David Jordan, Peoria, AZ, pro se.

### ORDER

McPHERSON, United States Magistrate Judge.

In this civil action, filed on 28 December 1995, plaintiff STEPHANI JOHNSON ["Johnson"], a former Wal–Mart employee, made the following allegations against the defendants, Wal–Mart and David Jordan ["Jordan"], her former supervisor: (1) *quid pro quo* sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, (2) the tort of outrage, (3) assault and battery, (4) interference with contractual relationship, and (5) invasion of privacy. Her husband, plaintiff ANTHONY JOHNSON alleged a cause of action for loss of consortium.

The action is now pending upon the clerk's entry of default judgment against defendant Jordan and the plaintiffs' request for an adjudication of damages against Jordan. The court conducted an evidentiary hearing on 18 August 1997. Upon consideration of the default judgment entered against the defendant, the pleadings in this record, and the evidence presented at the hearing, the court finds that the plaintiffs are entitled to a judgment in the amount of $13,501.

## I.  PROCEDURAL HISTORY

The record reflects that Wal–Mart was served with a copy of the complaint on 8 January 1996 and that Jordan was served on 10 January 1996.  Wal–Mart answered the complaint on 31 January 1996, but Jordan never answered.  Accordingly, in response to the plaintiffs' application for default against Jordan (Doc., # 10), the Clerk of the court entered a default judgment against Jordan on 11 June 1996 (Doc. # 11).

Wal-Mart filed a motion for summary judgment on all issues on 3 December 1996 (Doc. # 19), which the court granted in full on 7 July 1997, dismissing Wal–Mart as a party to the action.  Pursuant to the plaintiffs' subsequent request, the court set and conducted an evidentiary hearing on 18 August 1997 to receive evidence on the amount of damages sustained by the plaintiffs because of Jordan's liability on the four state law claims.[1]  Both of the plaintiffs testified at the hearing.

## II.  FINDING OF FACTS [2]

### A.  *The Defendant's Conduct*

Johnson was initially hired by Wal–Mart on 1 July 1982.[3]  During the relevant time period, Johnson worked as the safety and loss prevention manager at the Wal–Mart Supercenter (store # 424) in Clanton, Alabama, which was managed by David Jordan.

On 27 May 1994, Johnson was instructed by Jordan to meet him at the Shoney's Inn in Clanton to review certain documents regarding the apparent theft of two rifles, which had disappeared from the store earlier that day.[4]  Apparently, Jordan was living at the Shoney's Inn at that time.  Johnson arrived there after 5:00 p.m.[5]

When Johnson arrived at his room, Jordan got a beer from a cooler and told Johnson that he did not have any paperwork but that he did want to discuss the missing rifles with her.[6]  Jordan told her that she did not have "to worry about [her] job" and to "[j]ust stay ..., sit down ... a while, calm down, and we'll discuss it." [7]  He also told her that her job was not in "jeopardy" and that he would "handle everything." [8]  Johnson rose to leave when Jordan wrapped his arms around her waist and told her that she could not leave the room crying.[9]

When Johnson attempted to leave again, Jordan shut and locked the door.[10]  Johnson contends that Jordan pulled her toward the bed, telling her to sit and calm down.[11]  Jordan then told Johnson to "stay with him" and that "he would take care of everything." [12]  Johnson headed for the door a third time when Jordan attempted to hug and to kiss her.  Johnson pushed him away and left the room.[13]

On her next day of work, Johnson saw Jordan at the time clock.  Jordan asked if she were avoiding him, and she responded that she was not.  He then commented that

---

1.  The court has already advised the plaintiffs that the judgment against Jordan applies only to the state law claims, since individual liability may not be imposed in a Title VII cause of action.  *Smith v. Capitol City Club of Montgomery,* 850 F.Supp. 976 (M.D.Ala.1994); *Busby v. City of Orlando,* 931 F.2d 764, 773 (11th Cir.1991).

2.  The court's findings of facts are based on the record and on the testimony at the hearing.

3.  Johnson Dep., Exhibit 12.

4.  Johnson Dep. at 45–46.

5.  *Id.* at 46–47.

6.  *Id.*

7.  *Id.* at 47.

8.  *Id.*

9.  *Id.* at 47–48.

10.  *Id.* at 48–49.

11.  *Id.* at 49.

12.  *Id.*

13.  *Id.* at 49–50.  The court will refer to this incident as the "Shoney's Inn incident."

he had "saved [her] butt on the gun deal." [14] Johnson responded: "I don't have any idea what you're talking about. I have a job to do." [15]

After the Shoney's Inn incident, Jordan made daily comments about Johnson's appearance. In her deposition, Johnson testified that: "On a day-to-day basis he would make comments of the way I was dressed, how my hair looked. I looked sexy today, I looked good today, or that I needed to dress up a little more often for my job situation." [16]

In November, 1994, Johnson's position, safety and loss prevention manager, was eliminated, and its duties were combined with those of another position. [17] Around this time, the manager of the cosmetics department resigned, and Johnson was given that position. [18] Jordan told Johnson in his office that her position was being eliminated. When she began to leave his office, he grabbed her and told her to sit down. [19] Johnson testified in her deposition that although Jordan did not touch her affectionately she considered his touching a sexual overture because "[f]or no reason should he have touched [h]er." [20] Johnson did not suffer a cut in pay or benefits when she became manager of the cosmetics department, however, she felt that she was understaffed and that she needed additional help. [21]

Wal-Mart's harassment policy, as set forth in a July, 1991 associate handbook, provides as follows:

> Harassment of any type whether sexual, ethnic, racial, etc. is not tolerated at Wal-Mart. We want to provide a work environment where everyone is comfortable. Harassment includes offensive language, gestures, physical contact or other conduct which destroys that environment.
>
> If you have any problems with or questions concerning harassment, use our Open Door Policy. If your immediate supervisor is part of the problem, go to the next level of management. There will be no retaliation for reporting harassment and all reports of harassment will be investigated.
>
> Your individual privacy will be of utmost importance. Individuals who engage in harassment will be disciplined up to and including termination depending on the circumstance.
>
> Harassment of any type is inconsistent with Wal-Mart's belief in respect for the individual and will not be allowed. [22]

Wal-Mart commenced an investigation of complaints against Jordan in February, 1995, and shortly thereafter, he resigned. Johnson testified at the hearing that even after he departed, some of her fellow employees, loyal to Jordan, continued to harass her (though not sexually). There was no evidence that Jordan participated in, directed or was even aware of the harassment that occurred after his departure. On 8 April 1995, almost two months after Jordan's resignation, Johnson tendered a letter of resignation to Wal-Mart officials, giving them three weeks notice. Johnson Dep. at 115–118. In her resignation letter, Johnson stated that it was with "sincere regret" that she was resigning and that "[f]rom May 1994 until the recent termination of David Jordan [she had] experienced

---

14. *Id.* at 53.

15. *Id.* at 53–54.

16. *Id.* at 76.

17. *Id.* at 54; Stansberry Decl. at ¶ 4.

18. Johnson Dep. at 56–58, 77.

19. *Id.* at 53, 77–82.

20. *Id.* at 78–79. The court will refer to this incident as the November, 1994 incident.

21. *Id.* at 83, 86–87, 110. Johnson contends that even after Jordan left Wal-Mart, she was refused additional staff. Johnson Dep. at 87. For example, Johnson claims that Stansberry's verbal reprimand in January, 1995 for not putting away certain inventory was unfair. *Id.* at 89–90.

22. Johnson Dep., Exhibit 3. Another associate handbook which is undated, but, according to Johnson's deposition testimony, was used in 1994, contains a similar harassment policy. Johnson Dep. at 73 and Exhibit 4.

working conditions that no employee should be forced to cope with".[23] *Id.*, Exhibit 8.

## B. The Plaintiffs' Responses

After the Shoney's incident, Johnson did not contemporaneously tell her husband about the incident. Instead, she "shut down" and stopped communicating freely with her husband, her family, and her friends. She testified that Jordan's harassment caused her to be "extremely nervous and upset" and that she "thought that [she] was responsible for his actions". She also testified that the incidents "affected sexual relations with [her] husband", that she didn't feel comfortable engaging in sex with him and didn't want to talk to him. Both Johnson and her husband testified that after the incident, she "closed off from everyone".

Johnson also testified that even after Jordan left Wal–Mart's employ in February, 1995, she continued to feel the "effects of the harassment" and continued "to have stress". Johnson saw her doctor, Paul Perry and told him that she was having problems having sex with her husband. She did not tell him about Jordan's actions nor did she discuss with him any harassment on the job. Dr. Perry diagnosed her condition as endometriosis (based primarily on her report of pain); he recommended surgery and prescribed medication.[24] At no time before he performed the surgery was Dr. Perry aware of Johnson's problems at work. The evidence established that neither Dr. Perry or any other physician or health care professional has treated either Johnson or her husband for any reported conditions arising from Jordan's actions.

According to Anthony Johnson's testimony, his relationship with Johnson could not have been better before May, 1994 when the Shoney's incident occurred. He said that his wife turned away from him and that Jordan's actions "really messed her up. All she did was work, come home and go to sleep". He further stated that they stopped doing things together, such as hunting and fishing. They did not seek counseling because he did not know the cause of the change in his wife and "figured that [they] would work through it". He first learned about the harassment in January or February, 1995. They discussed the incidents at length at that time, and he believes that Jordan is responsible for his wife's problems.

## C. Johnson's Economic Loss

Calendar year 1994 was the last full year that Johnson worked at Wal–Mart, and she earned a gross salary of $11,780 in that year, receiving her last raise in July, 1994.[25] When she resigned from Wal–Mart, her hourly wage was $7.65 for a 40–hour week. She participated in Wal–Mart's profit-sharing plan and withdrew approximately $17,000 after taxes upon her departure. She was unable to state, however, the percentage of her income that the company contributed to her profit share or the rate at which the amount was contributed.

Since her resignation, Johnson has been unemployed. She has applied for two positions and was actually offered a position.

---

**23.** Johnson concluded her letter with the following sentiments:

I had sincerely hoped that my continued employment at WalMart [sic] would be possible but the conditions and feelings that exist will not allow me to enjoy a normal working relationship.

Since the loss of Sam Walton, the management philosophies and employment conditions have changed drastically throughout WalMart. In the past the conditions that exist today would not have been tolerated and experiences like mine would never have been allowed to continue. I am a 13 year senior employee at 424 yet I feel no longer welcome at this store.

My last day of employment will be 4–28–95 thus ending a career at WalMart that until recently had been fulfilling and rewarding.

**24.** Dr. Perry appears to indicate in his deposition that before he saw the plaintiff in June, 1994, he had not examined her since 1992. The plaintiff made appointments in 1993, specifically in September, but did not appear for the appointments.

**25.** She received annual raises which ranged from $.20 to $.50.

She declined it because the salary of $6.50 per hour was insufficient due to travel and child care requirements. She is currently employed at her husband's construction business as a bookkeeper, earning $300 per month. She has worked there at that salary continuously since June, 1996.

## III. DISCUSSION

### A. The Elements of Liability

Although the plaintiffs have been awarded judgment by default in this case, it is useful to review the substantive elements and requirements of the state law causes of action upon which they recover in this case. Notwithstanding the judgment, the plaintiffs must still prove by a preponderance of the evidence that they sustained injury or damages that were caused by Jordan's conduct to recover.

■ *1. The Tort of Outrage.* To establish the tort of outrage, the plaintiff must prove three elements: "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe." *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835 (Ala.1992) (*quoting Perkins v. Dean*, 570 So.2d 1217, 1219 (Ala.1990)).

■ The Alabama Supreme Court has suggested that limited forms of sexual harassment do constitute outrage. *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926, 935 (N.D.Ala.1996). However, "[m]ere requests for sexual favors are not sufficient." *Brewer, supra (citing McIsaac v. WZEW–FM Corp.*, 495 So.2d 649, 651 (Ala.1986)).[26] "Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient." *Id.*

"However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties. An employee can decline even the most obscene request to be touched in a sexual manner. An employee cannot decline a physical act that has already occurred. At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society." *Brewer (citing Busby*, 551 So.2d at 324).

■ "There can be no recovery for the tort of outrage unless all four elements are established." *U.S.A. Oil, Inc. v. Smith*, 415 So.2d 1098, 1100 (Ala.Civ.App.1982). Johnson's testimony—and that of her husband, Anthony—does not establish, with legal sufficiency that her emotional distress was caused by Jordan's actions. Her response to the harassment is consistent with emotional distress, but the court cannot conclude that it was severe. She continued to go to work each day and to perform her responsibilities satisfactorily. Although she "shut down" af-

26. *See e.g. Brassfield v. Jack McLendon Furniture, Inc.*, 953 F.Supp. 1438 (M.D.Ala.1996) (male manager's conduct was not extreme and outrageous as required to support outrage claim under Alabama law; manager told female employee that females were lesser persons than males, pointed his finger at female employee and pretended to "blow her away," stated that any woman wearing panties could leave work early, asked employee whether "P" on her necklace stood for "prostitute," asked another female employee whether she wore panties, called employee "stupid bitch" on several occasions and told employee he would fill her orders "when he was good and damn ready"; other male manager's conduct also was not extreme and outrageous as required to support outrage claim under Alabama law; manager commented that he ate chicken breasts that reminded him of female employee, joked about nude portrait that employee brought to work, speculated about which female employee would last longest at work, and speculated about employee's sex life with other sales persons; other defendant's conduct was not extreme and outrageous as required to support outrage claim under Alabama law; manager commented that he did not like women and that he was going to be sure that female employee did not remain at work, threatened employee with clenched fist while stating "If I hear one more word out of you, girl, I'm going to slap your teeth out of your head." and claimed, in front of customers and sales persons, that employee had stolen one of manager's customers).

ter the Shoney's incident, there was no evidence that she ceased her daily activities at home, such as caring for her children, personal hygiene, housekeeping responsibilities. Nor was there sufficient evidence of Johnson's pre-harassment conduct and demeanor for this court to make a reasoned conclusion regarding causation.

> "[I]n order to prevent the tort of outrage from becoming a panacea for all of life's ills, recovery must be limited to distress that is severe. In describing the type of distress that would support recovery our supreme court stated that '[t]he emotional distress ... must be so severe that no reasonable person could be expected to endure it.'" [*American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980)]

*U.S.A. Oil, Inc. v. Smith, supra,* at 1101.

Johnson has not met that standard and thus the court concludes that she is entitled to nominal damages only and awards $1.00 as damages for the tort of outrage.

■ **2.** *Invasion Of Privacy.* Alabama has accepted the definition of the Tort of Invasion of Privacy as set forth in *Prosser, The Law of Torts. See Cates v. Taylor,* 428 So.2d 637, 639 (Ala.1983). As analyzed in *Cates,* there are four acts which constitute an invasion of privacy in Alabama. These are: "(1) 'the intrusion upon the plaintiff's physical solitude or seclusion,' (2) 'publicity which violates the ordinary decencies,' (3) 'putting the plaintiff in a false but not necessarily defamatory position in the public eye,' and (4) 'the appropriation of some element' of the plaintiff's personality for a commercial use." *See also Busby,* 551 So.2d at 323.

In *Hogin v. Cottingham,* 533 So.2d 525 (Ala.1988), the Alabama Supreme Court elaborated on a wrongful intrusion claim:

> [T]here must be something in the nature of prying or intrusion and the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be, and be entitled to be, private. Two primary factors are considered in de-

termining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information.

*Id.* at 531 (citations and internal quotations omitted).

Consistent with case law, Jordan's attempts to kiss or fondle Johnson in May, 1994, his physical altercation with her in his office, and his subsequent and repeated comments about her appearance and dress may be the basis of a privacy claim. *See e.g. Kelley v. Troy State Univ.,* 923 F.Supp. 1494, 1503 (M.D.Ala.1996) (denying motion to dismiss invasion of privacy claim where defendant: made sexually explicit remarks and jokes at the expense of women; made degrading personal comments to plaintiff, such as telling her she was having "a blond attack" when she made an error, and to "show a little leg" when a male colleague was coming to the office; and on several occasions, defendant struck plaintiff, either with an open hand or a closed fist).

Most instructive is the Eleventh Circuit's and the Alabama Supreme Court's analysis in *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524 (11th Cir.1983). *Phillips,* a case tried in the Alabama's Northern District, was appealed after judgment was rendered for a former employee against her employer for wrongful discharged based on sexual harassment. The plaintiff's claims included several state law claims, including invasion of privacy, and the Court of Appeals certified several questions to the Alabama Supreme Court. In its canvassing of Alabama case law, the Supreme Court categorized instances of the invasion of privacy. The category into which the facts of the instant case best fit is "wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities". *Phillips,* at 1537.

In *Phillips,* the employer sexually harassed the plaintiff in the following ways, *inter alia:* (1) questioning her about her

sexual relationship with her husband, (2) calling her into his office, locking the door, and propositioning her for sex, (3) repeatedly propositioning her for oral sex, (4) inviting her to have drinks with him after hours, (5) threatening her with termination if she refused to have sex with him, (6) angrily demanding that she have oral sex with him at least three times per week, and (7) hitting her "[a]cross the bottom" as she tried to leave his office.

The facts of the instant case are not as extreme as those in *Phillips;* however, the evidence established that Jordan wrongfully intruded into Johnson's private activities and that his intrusion cause her mental suffering, shame, and humiliation.[27] It is similarly clear to this court that, under the same circumstances, a person of "ordinary sensibilities" would have had the same or similar reaction.[28]

■ Notwithstanding Jordan's liability to Johnson for invasion of privacy, the plaintiff's evidence is insufficient to hold Jordan liable for damages which flow from her voluntary termination of her employment. First, constructive discharge is a cause of action which has arisen in federal case law in Title VII and other discrimination cases. There is no Alabama cause of action for constructive discharge, particularly in view of the fact that Johnson was an employee-at-will with no contractual protection. Second, Jordan had resigned two months before Johnson resigned, and there is no evidence that he retained any influence whatsoever in her workplace after he departed. Thus, the court will award no damages which flow from Johnson's termination of her own employment.

■ **3. Interference With A Contractual Relationship.** In *Cahaba Seafood, Inc. v. Central Bank of the South,* 567 So.2d 1304 (Ala.1990), the Alabama Supreme Court stat-

ed the following elements which are necessary to establish a claim of intentional interference with contractual relations:

(1) the existence of a contract or business relation;

(2) defendant's knowledge of the contract or business relation;

(3) intentional interference by the defendant with the contract or business relation; and

(4) damage to the plaintiff as a result of the defendant's interference.

*Id.* at 1306 (*citing Lowder Realty, Inc. v. Odom,* 495 So.2d 23, 25 (Ala.1986)).

In the instant case, Johnson had no *contract* of employment with anyone. Moreover, her "business relation" was with Wal–Mart, not with Jordan. Accordingly, Johnson may not recover on this ground.

■■ **4. Loss Of Consortium.** Loss of consortium is a "derivative" tort which exists only if the defendant is also liable in tort to the spouse who is unable to provide consortium. Proof of the underlying tort is a necessary element of an action for loss of consortium. *Godby v. Electrolux Corp.,* Nos. 1:93–CV–0353–ODE, 1:93–CV–1260–ODE, 1993 WL 406047 *2 (N.D.Ga. August 23, 1993).

Given Jordan's liability to Johnson for invasion of privacy, he is derivatively liable to Anthony Johnson for his loss of consortium. The evidence of loss of consortium, including sexual relations with his wife, her companionship, and her company, was abundant.

**B. The Plaintiffs' Economic Loss**

Because the court will not award damages which flow from Johnson's voluntary resigna-

---

27. Neither Johnson or her husband testified explicitly that she was ashamed or humiliated, but the court infers those emotions from the evidence that she did not tell her doctor or her husband and the evidence that she initially blamed herself for Jordan's harassment.

28. The facts of the Shoney's incident are also sufficient to prove assault upon the plaintiff. Accordingly, the court has merged its determination of Jordan's liability on that cause of action with its determination on Johnson's privacy claim.

tion, her losses in this case are limited to damages caused by Jordan's actions which she incurred from May, 1994 to April, 1995. Johnson's proof of those damages are divisible into two categories: (1) injury and losses incurred because of medical treatment, and (2) damages for mental suffering, shame, and humiliation.

■ The court concludes that Johnson is not entitled to any recovery for the medical treatment that she received after May, 1994, because she has failed to established that the treatment was causally related to her harassment by Jordan. Johnson initially sought treatment for pelvic pain which *she* associated with sexual harassment. It is apparent, however, that she had experienced similar pain long before the Shoney's incident.

Dr. Perry stated that Johnson reported her problems as "pain with periods, heavy flow, clotting, pain with intercourse, pelvic heaviness, one or two days of cramping before periods *that had been there for at least six months* " (Perry depo. at p. 14; Emphasis supplied). Dr. Perry also noted that "for the past four months she had increasing cramping and clotting with her periods" *Id.* Even the pain was explained in a manner that is inconsistent with Johnson's assignment of fault to Jordan. Dr. Perry stated that, based on the medical history that Johnson provided to him at the June, 1994 appointment, he diagnosed her pain as due to "deep thrust dyspareunia", which he defined as "pain during intercourse whenever the penis is inserted deeply into the vagina". (Perry depo. at p. 15).

Johnson told Dr. Perry, however, that she had been having that problem for two years following the delivery of her twins in 1992. Dr. Perry specifically noted: "I suspect endometriosis is the etiology of her pain." *Id.* at p. 16. Endometriosis is a "GYN condition that's caused by the cells that line the uterus being displaced outside the uterus, causing inflammation in the pelvic cavity". The condition is caused by "reflux menstruation where the menstrual fluid is carried by the fallopian tubes into the pelvic cavity and the endometriosis cells are washed into the pelvic cavity and begin to grow as they're seeded into the pelvic cavity". *Id.* at pp. 16–17.

Dr. Perry specifically discounted emotional trauma as a source or cause of endometriosis. *Id.* at p. 18. Dr. Perry's diagnosis was confirmed during the surgery. He examined and treated Johnson on several occasions after the surgery for pain, but he never diagnosed causality as related to the harassment perpetrated by Jordan. Finally, Dr. Perry stated that Johnson did not complain of depression and that compared to other patients who complain of pain, her apparent stress level was "not above average". Based on the foregoing, Johnson is not entitled to recover damages for her medical treatment.

■ Johnson may recover for her mental suffering.

A plaintiff may recover substantial general damages that naturally and necessarily flow from the wrongful act, and may also recover all special damages which proximately result from the breach of his privacy. C. Gamble & D. Corley, Alabama Law of Damagers, §§ 326–38 at 432 (1982). This authority suggests a jury instruction that allows assessment of damages for 'mental suffering,' 'shame and humiliation,' and 'other damages,' and observes that in such cases it is not necessary to plead or prove special damages.

*Phillips, supra,* at p. 1537.

■ In *Phillips,* the Court of Appeals determined that an award of $25,000 was appropriate. In another case with similar facts, of lesser severity than in *Phillips,* the Fifth Circuit upheld an award of $7,500. *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803 (5th Cir.1996) (court awarded plaintiff $7,500 in compensatory damages and no punitive damages when she presented corroborated evidence that her supervisor inquired into her sexual activity, offered to have sex with her, attributed her large number of children to her desire for sex, and generally made sexual comments in the workplace). Upon consideration of the facts

presented by Johnson in the instant case, the court concludes that an award of compensatory damages of $8,500 is appropriate for invasion of privacy, and an award of $5,000 is appropriate for Anthony Johnson's loss of consortium. The court declines to award punitive damages because Johnson did not prove that Jordan acted with malice or with deliberate indifference.

## IV. CONCLUSION

Accordingly, it is ORDERED, ADJUDGED, and DECREED that:

1. Plaintiff STEPHANI JOHNSON shall recover the sum of $8,501 from the defendant DAVID JORDAN for the tort of outrage, invasion of privacy and assault and battery;

2. Plaintiff ANTHONY JOHNSON shall recover the sum of $5,000 from the defendant DAVID JORDAN for loss of consortium;

3. Judgment is entered in favor of the defendant and against the plaintiff STEPHANI JOHNSON on her substantive claim of tortious interference with a contractual relationship, and on her claim for punitive damages; and

4. The plaintiffs' costs in this action are assessed against DAVID JORDAN.