Stephani **JOHNSON** and Anthony Johnson, Plaintiffs,

v.

**WAL–MART STORES, INC.,** et al., Defendants.

No. CIV.A. 95–M–1645–N.

United States District Court, M.D. Alabama, Northern Division.

July 7, 1997.

Melissa C. Bowen, Prattville, AL, for Plaintiffs.

Charles A. Powell, III, Spencer A. Kinderman, Johnston, Barton, Proctor & Powell, Birmingham, AL, for Defendants.

David Jordan, Peoria, AZ, pro se.

## MEMORANDUM OPINION AND ORDER

McPHERSON, United State Magistrate Judge.

The plaintiffs, Stephani Johnson ["Johnson"] and Anthony Johnson, filed the complaint in this civil action on 28 December 1995 alleging that she was sexually harassed while employed by Wal–Mart Stores, Inc. ["Wal–Mart"] in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5. Johnson also alleges Title VII retaliation and constructive discharge causes of action and the torts of outrage, interference with a contractual relationship and invasion of privacy. Mr. Johnson alleges a loss of consortium cause of action. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

This cause is now before the court on Wal–Mart's motion for summary judgment. For the reasons that follow, the motion is GRANTED, and all of the plaintiffs' claims against Wal–Mart are dismissed with prejudice.

### I. FACTS

#### A. Background

Johnson was initially hired by Wal–Mart on 1 July 1982.[1] During the relevant time period, Johnson worked as the safety and

1. Johnson Dep., Exhibit 12.

loss prevention manager at the Wal–Mart Supercenter (store # 424) in Clanton, Alabama. As such, she was responsible for preventing the theft of store merchandise.[2] Susan Stansberry ["Stansberry"] was the co-director.[3] David Jordan ["Jordan"] was the store director, and Norm Banworth was the district manager.

## B. The Alleged Harassment

On 27 May 1994, Johnson was instructed by Jordan to meet him at the Shoney's Inn in Clanton to review certain documents regarding the apparent theft of two rifles, which had disappeared from the store earlier that day.[4] Apparently, Jordan was living at the Shoney's Inn at that time. Johnson arrived there after 5:00 p.m.[5]

Once in his room, Jordan got a beer from a cooler and told Johnson that he did not have any paperwork but that he did want to discuss the missing rifles with her.[6] Jordan told her that she did not have "to worry about [her] job" and to "[j]ust stay ..., sit down ... a while, calm down, and we'll discuss it."[7] He also told her that her job was not in "jeopardy" and that he would "handle everything."[8] Johnson got up to leave when Jordan wrapped his arms around her waist and told her that she could not leave the room crying.[9]

Johnson attempted to leave again but Jordan shut and locked the door.[10] Johnson contends that Jordan pulled her toward the bed, telling her to sit and calm down.[11] Jordan then told Johnson to "stay with him" and that "he would take care of everything."[12] Johnson headed for the door a third time when Jordan attempted to hug and to kiss her. Johnson pushed him away and left the room.[13]

On her next day of work, Johnson saw Jordan at the time clock. Jordan asked if she were avoiding him, and she responded that she was not. He then commented that he had "saved [her] butt on the gun deal."[14] Johnson responded: "I don't have any idea what you're talking about. I have a job to do."[15]

After the Shoney's Inn incident, Jordan made daily comments about Johnson's appearance. In her deposition, Johnson testified that: "On a day-to-day basis he would make comments of the way I was dressed, how my hair looked. I looked sexy today, I looked good today, or that I needed to dress up a little more often for my job situation."[16]

On 1 June 1994, Johnson had her annual performance review with Stansberry. Johnson's performance was rated "above standard," and she received a forty-cent raise.[17] Johnson's review lasted approximately thirty minutes, during which time Johnson did not complain to Stansberry about the Shoney's Inn incident.[18] Johnson claims that she feared Stansberry would fire her. In November, 1994, Johnson's position, safety and loss prevention manager, was eliminated, and

---

**2.** Johnson Dep. at 45–46.

**3.** Stansberry Decl. at ¶ 2.

**4.** Johnson Dep. at 45–46.

**5.** *Id.* at 46–47.

**6.** *Id.*

**7.** *Id.* at 47.

**8.** *Id.*

**9.** *Id.* at 47–48.

**10.** *Id.* at 48–49.

**11.** *Id.* at 49.

**12.** *Id.*

**13.** *Id.* at 49–50. The court will refer to this incident as the "Shoney's Inn incident."

**14.** *Id.* at 53.

**15.** *Id.* at 53–54.

**16.** *Id.* at 76.

**17.** Johnson Dep., Exhibit 12.

**18.** Johnson Dep. at 40–41.

its duties were combined with those of another position.[19] Around this time, the manager of the cosmetics department resigned, and Johnson was given that position.[20] Jordan told Johnson in his office that her position was being eliminated. When she began to leave his office, he grabbed her and told her to sit down.[21] Johnson testified in her deposition that although Jordan did not touch her affectionately she considered his touching a sexual overture because "[f]or no reason should he have touched [h]er."[22] Johnson did not suffer a cut in pay or benefits when she became manager of the cosmetics department, however, she felt that she was understaffed and complained that she needed additional help in cosmetics.[23]

Wal–Mart's harassment policy, as set forth in a July, 1991 associate handbook, provides as follows:

> Harassment of any type whether sexual, ethnic, racial, etc. is not tolerated at Wal–Mart. We want to provide a work environment where everyone is comfortable. Harassment includes offensive language, gestures, physical contact or other conduct which destroys that environment.
>
> If you have any problems with or questions concerning harassment, use our Open Door Policy. If your immediate supervisor is part of the problem, go to the next level of management. There will be no retaliation for reporting harassment and all reports of harassment will be investigated.

> Your individual privacy will be of utmost importance. Individuals who engage in harassment will be disciplined up to and including termination depending on the circumstance.
>
> Harassment of any type is inconsistent with Wal–Mart's belief in respect for the individual and will not be allowed.[24]

It is undisputed that Johnson had read and was familiar with the handbook and the harassment policy. Nor does Johnson dispute that she knew of and never utilized the company's 1–800 employee complaint number, which was posted in the break room of store in which she worked.[25] It is equally undisputed that Johnson did not complain of the alleged harassment until 13 February 1995, although she saw at least two female assistant managers, January Giles ["Giles"] and Linda Shafley ["Shafley"], on a daily basis. Johnson stated that she feared that they would retaliate against her.[26] Johnson did not contemporaneously tell her husband or her doctor about Jordan's conduct. She did, however, tell at least three of her co-workers about the Shoney's Inn incident.[27]

### C. Wal–Mart's Investigation Of Another Employee's Allegations

On 1 December 1994, the father-in-law of Donna Gibson ["Gibson"], a former Wal–Mart employee, told Susan Stansberry that Jordan had "hit on" Gibson.[28] Stansberry informed Bill Dillaha ["Dillaha"], then Area Vice President, about her conversation with

---

19. *Id.* at 54; Stansberry Decl. at ¶ 4.

20. Johnson Dep. at 56–58, 77.

21. *Id.* at 53, 77–82.

22. *Id.* at 78–79. The court will refer to this incident as the November, 1994 incident.

23. *Id.* at 83, 86–87, 110. Johnson contends that even after Jordan left Wal–Mart, she was refused additional staff. Johnson Dep. at 87. For example, Johnson claims that Stansberry's verbal reprimand in January, 1995 for not putting away certain inventory was unfair. *Id.* at 89–90.

24. Johnson Dep., Exhibit 3. Another associate handbook which is undated, but, according to

Johnson's deposition testimony, was used in 1994, contains a similar harassment policy. Johnson Dep. at 73 and Exhibit 4.

25. *Id.* at 41, 44, 70, 74 and Exhibit 5.

26. *Id.* at 41–42. However, in other deposition testimony, Johnson stated that she did not fear that Giles or Shafley would fire her if she complained to them about Jordan's conduct. *Id.* at 42.

27. *Id.* at 14, 37–38, 60–63.

28. Stansberry Decl. at ¶ 7, Dillaha Dep., Exhibits 2 and 6.

Gibson's father-in-law.[29] A few days later, Dillaha visited the Clanton Wal–Mart to investigate Gibson's claims.[30] Jordan denied any inappropriate behavior, and Dillaha's interviews with other employees did not confirm or refute Gibson's claims.[31] Dillaha told Jordan that if Gibson's allegations were later corroborated, he (Jordan) would be terminated. Dillaha attempted to speak with Gibson, but Gibson's counsel refused his request.[32]

### D. Wal–Mart's Investigation Of Johnson's Allegations

On 30 January 1995, Marsha Siler ["Siler"], the deli department manager, called Joe Tapper ["Tapper"], a regional Vice–President for Wal–Mart, at the corporate office in Bentonville, Arkansas, to complain about Jordan's conduct.[33] Tapper asked Siler if she would provide him with the names of the female employees who had problems with Jordan's conduct, and Siler agreed to do so once Tapper came to the Clanton store.[34] Tapper Decl. at ¶ 6. Tapper directed Norman

29. Stansberry Decl. at ¶ 7.

30. Id.; Dillaha Dep. at 15.

31. Dillaha Dep. at 16–20.

32. Id. at 20–21.

33. Siler Aff. at ¶ 6; Tapper Decl. at ¶ 1. Tapper recalled that Siler spoke to him in late January or early February, 1995 about her resignation from Wal–Mart. According to Tapper, at the end of that conversation, Siler mentioned that she thought that Jordan was sexually harassing two employees. He remembers that Siler refused to reveal the employees' identities until he came to the store to investigate the matter. Tapper Decl. at ¶ 6.

34. Tapper contends in his affidavit that he first learned of Johnson's complaints from Kathie McWerter ["McWerter"], the Regional Personnel Manager, in early February, 1995. Tapper Decl. at ¶ 5. The record does not indicate how McWerter learned of Johnson's complaints. Nor does the record indicate when McWerter learned of Johnson's complaints. Tapper contends that he directed Banworth to investigate the alleged sexual harassment on the basis of his conversations with Siler and McWerter.

35. Johnson's written statement dated 13 February 1995 says, in pertinent part, the following:

Banworth ["Banworth"] to conduct an investigation. Id. at ¶ 7; Banworth Dep. at 15.

On 13 February 1995, Banworth visited the Clanton Wal–Mart. After meeting with managers and store employees, Banworth spoke with Chris Copeland, a bakery store employee, who suggested that he (Banworth) speak to Johnson. Banworth Dep. at 28–29, 79; Johnson Dep. at 14, 36. Johnson told Banworth about the missing gun incident and the Shoney's Inn incident with Jordan. Banworth Dep. at 31, 35–36. She did not, however, complain about the November, 1994 incident. Johnson Dep. at 79. Banworth asked Johnson what she wanted done to Jordan, and Johnson responded that she wanted him "terminated" "or...retrained." Banworth Dep. at 37. Jordan was suspended during the company's investigation. Id. at 72. Banworth also asked Johnson to provide a written statement containing all of her allegations, and Johnson did so.[35] Johnson Dep. at 113–114.

On February 16th, Banworth questioned Johnson about the location of the hotel room

As I got up to leave David pulled me to him and hugged me. He said I was to [sic] upset that I could not leave that way. David still had his arm around my waist and guided me over to the bed he sat down with his arm around me. I told him again tha [sic] I had to go and moved his had [sic] and walked to the door but he pushed the door to again. He put his arm around me and started to kiss me but I pushed him back and told him I had to leave. This time I did make it out the door.

I was crying and very upset at myself and at him for trying to use me in that way. I fell [sic] sure this wasn't the first time that he has tried this.

David Jordan should pay for [sic] actions. WalMart is based on trust and David Jordan is not a Sam Walton Team Player.

Since this occurance [sic] David has treatened [sic] my job when we were doing MOPAR I was Safety thoss [sic] Preventio [sic] Team leader.

He has often said that I hated him now and I did not acknowlege [sic] the commint [sic]. When we were scheduled to go to the Safety + Loss Prevention meeting last year he Said [sic] this would give us a chance to talk but I would not have gone with him by myself. Susan Stansburry went on the trip with us.

Johnson Dep., Exhibit 6.

in which the Shoney's Inn incident occurred. Banworth Dep. at 39. Banworth's subsequent investigation confirmed that Jordan's room was the fourth or fifth room on the second floor as alleged by Johnson. *Id.* at 40, 51.

As a part of his investigation, Banworth also spoke to approximately twenty female employees. *Id.* at 44, 48. Banworth asked each employee the same six questions: (1) If there was anything that they wanted to talk to him about; (2) how they felt about management on a scale of one to five; (3) whether the open door policy worked for them; (4) whether they felt that they could talk to management; (5) had they seen any inappropriate behavior from management; and (6) how they would rate the store morale on a scale of one to five. *Id.* at 46–47. None of the employees reported any inappropriate conduct. *Id.* at 48.

Banworth also spoke with two of the employees to whom Johnson had complained. *Id.* at 51–52. The employees confirmed that Johnson had told them about the Shoney's Inn incident. *Id.* at 52. In addition, Banworth spoke to Marsha Siler. Siler told him that Johnson had been sexually harassed by Jordan.[36] Siler Aff. at ¶ 7; Siler Dep. at

126–127. Siler also stated that she had told Johnson to call Brian Hardin or the "1–800" number posted in the break room. Banworth Dep. at 83–84.

Greg Clayborn, the Regional Loss Prevention Manager, assisted Banworth in the company's investigation by interviewing Jordan. Jordan denied Johnson's allegations verbally and in a written statement, but resigned from his position on 16 February 1995. Complaint at ¶ 10; Banworth Dep. at 50, 53, 56. Jordan was replaced by Jonathan Harris. Johnson Dep. at 85. The company has never made an ultimate finding on Johnson's allegations. Banworth Dep. at 55, 66.

### E. The Testimony Of Marsha Siler

Because of the discrepancies between the deposition testimony and the affidavit testimony of Marsha Siler, the deli manager of the Clanton Wal–Mart Supercenter during the relevant period, the court will evaluate her testimony separately.[37] Viewing Siler's testimony in the light most favorable to the plaintiffs, however, the court makes the following findings of fact:[38] Siler complained to Mark Swartz ["Swartz"], Wal–Mart's Senior Vice–President, in July, 1994 about Jordan's conduct. Siler told Swartz that Jordan "of-

---

36. In another portion of her deposition, Siler testified that she told Banworth that she "suspected that something had happened to Stephani." Siler Dep. at 114.

37. In a letter to the court dated 8 January 1997, which the court is treating as a reply brief (Doc. # 25), Wal–Mart complained about the plaintiffs' characterization of Siler's testimony. Wal–Mart, however, did not move to strike Siler's affidavit.

38. The court is also concerned that Siler may have executed an affidavit without first reviewing it for accuracy. More importantly, the court is concerned about counsel's reliance upon this affidavit to oppose Wal–Mart's motion for summary judgment. Significantly, in her deposition, Siler testified as follows on direct examination:

> Q. You signed a paper stating some facts in this case, didn't you?
> A. Yes, I did.
> Q. That's called an affidavit.
> A. Okay.
> Q. And you didn't prepare that, did you?
> A. No, I didn't prepare it.

> Q. When did you first see this piece of paper that you were supposed to sign that had all of these facts on it?
> A. When Melissa [plaintiffs' counsel] brought it to me, she had to bring the affidavit to me to Delchamps?
> Q. **Did you read it before you signed it?**
> A. **I read, yeah, most of it.**
> Q. **You didn't read all of this, though?**
> A. **I don't know if I did or not to be real honest with you. At the time whenever I had that in front of me, I was extremely busy, and—**
> Q. So you don't know whether it's actually accurate or not, do you?
> A. Well, you know, I read what I had told her. And to the best of my memory, yes, what I told her that way that I remember it, the best that I can remember, yes, it's accurate.

Siler Dep. at 136–137 [emphasis added]. Although Siler ultimately testified that the affidavit was accurate, her own deposition testimony contradicts some of the facts to which she attested in her affidavit.

ten made derogatory comments about women" and that there were rumors about Jordan's dating of female subordinates and his drinking alcoholic beverages with these employees. Swartz told Siler that he would address her concerns.[39] Siler Aff. at ¶ 2. Siler contacted Swartz again in August, 1994, and told him about "problems concerning David Jordan's treatment of female employees." Siler Aff. at ¶ 3. Swartz told Siler that "he would handle the problem." [40] *Id.*

In November, 1994, Siler learned that Donna Gibson had left Wal–Mart. When Siler asked Jordan about his treatment of Gibson, Jordan blushed. Based on his reactions to her questions, Siler then began to suspect that Jordan's behavior had played some role in Gibson's resignation. Consequently, Siler telephoned Tapper's secretary and reported her suspicions, but she did not leave her name.[41] *Id.* at ¶ 4.

A few months later, on 5 January 1995, Siler asked Johnson if she had been having problems with Jordan.[42] Siler suspected that Jordan had been harassing Johnson because of the changes in Johnson's behavior and appearance. Johnson began crying and told her that she had been sexually harassed by Jordan.[43] *Id.* at ¶ 5. It was at this time that Siler contacted Tapper.

## F. After The Investigation

On 8 April 1995, almost two months after Jordan's resignation, Johnson tendered a letter of resignation to Wal–Mart officials, giving them three weeks notice. Johnson Dep. at 115–118. In her resignation letter, Johnson stated that it was with "sincere regret" that she was resigning and that "[f]rom May 1994 until the recent termination of David Jordan [she had] experienced working conditions that no employee should be forced to cope with".[44] *Id.*, Exhibit 8.

She worked the remaining three weeks. On her last day of work—28 April 1995—

---

**39.** In her deposition, however, Siler was unsure that she had told Swartz these things. Siler Dep. at 144–147.

**40.** However, in her deposition, Siler testified that she did not contact Swartz until September, 1994. In that conversation, they discussed disciplinary measures which had been taken against her by Jordan and Stansberry. According to her deposition testimony, she did not tell Swartz in their September conversation that Jordan had been harassing employees. Siler Dep. at 84, 90 and 101. Siler recalled that it was in a later conversation that she spoke to Swartz about Jordan's inappropriate conduct. *Id.* at 101. Indeed, in her deposition, she testified that she did not complain to Swartz about harassment until after she had called Tapper's secretary anonymously. *Id.* at 108–110. Siler stated: "I told Mark that I knew that David was guilty. I said I just know that he's guilty of doing something to Donna. I told him that. And I said this situation is so far out of control that if you all don't do something about it, you know, I told him personally I couldn't take it anymore." *Id.* at 110.

**41.** In her deposition, Siler testified that when she learned that Gibson was no longer employed, she teasingly asked Jordan: "what did you do, David, put your hands all over her and run her off or what?". Siler Dep. at 104. Siler stated that when Jordan's face turned "red as a beet," she knew that he acted inappropriately. *Id.* at 104–106.

Although Siler's affidavit states that she reported that Jordan was sexually harassing female

employees, her deposition testimony is less than clear. In her deposition, she indicated that she stated the following in her phone call to Tapper's secretary or to the 800 number: "I just told her, you know, what my feelings was. I said, you know, he is doing things that's not right in this store. I also explained that it wouldn't do any good to tell the co-director, that nothing would be done about it because the co-director didn't care." *Id.* at 107. In later deposition testimony, she appears to confirm that she spoke with Tapper's secretary. *Id.* at 130.

**42.** Johnson's opposition memorandum states that "[o]n or about Saturday, January 28, 1995, Marsha Siler asked Stephani Johnson if she had been sexually harassed by David Jordan." Pf.'s Opp. Brf., p. 5.

**43.** In her deposition, however, Siler testified that Johnson never told her that she had been sexually harassed by Jordan. Siler testified that: "As best I can remember, I don't think Stephani ever told me that she was. You know, not that I remember. I asked Stephani at one time, and she never answered me." Siler Dep. at 115, 127–128. In other testimony, she stated that no employee ever directly complained to her that Jordan had sexually harassed them. *Id.* at 118.

**44.** Johnson concluded her letter with the following sentiments:

I had sincerely hoped that my continued employment at WalMart [sic] would be possible but the conditions and feelings that exist will not allow me to enjoy a normal working relationship.

Wal–Mart officials conducted an exit interview with Johnson, who stated that she was quitting to stay at home. *Id.* at 115–118. Johnson also indicated her decision to stay at home on her exit interview form. *Id.,* Exhibit 9. Since her departure, Johnson has inquired about reemployment at the Clanton Wal–Mart Supercenter. *Id.* at 65.

## II. PROCEDURAL HISTORY

On 14 March 1995, one month after Jordan's resignation, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ["EEOC"] in Birmingham, Alabama.[45] Johnson Dep., Exhibit 7. The EEOC issued a right to sue letter on 18 October 1995. On 28 December 1995, Johnson and her husband filed the complaint in the instant action alleging sexual harassment, retaliation and constructive discharge in violation of Title VII and various state law causes of action. Wal–Mart filed its answer on 31 January 1996.

On 7 June 1996, the plaintiffs filed a motion for default judgment (Doc. # 10) against Jordan for failing to answer or otherwise plead. Shortly thereafter, on 11 June 1996, the clerk of the court issued an entry of default (Doc. # 11) against Jordan. On 3 December 1996, Wal–Mart filed the motion for summary judgment (Doc. # 19) presently before the court.[46]

In its motion, Wal–Mart contends that (1) there is no factual basis for *quid pro quo* liability; (2) Johnson's work environment was not hostile; (3) its immediate eradication of the allegedly offensive conduct upon notifi-

cation of the problem insulates it from Title VII liability; (4) it had no prior knowledge of the alleged sexual harassment, and its remedial response was effective; (5) Johnson's claims of retaliation and constructive discharge are meritless; and (6) it is not liable for the intentional tort claims.

Johnson filed her brief in opposition to the motion on 19 December 1996 (Doc. # 22), and Wal–Mart filed a reply brief on 9 January 1997 (Doc. # 25). Wal–Mart supplemented its brief on 3 June 1997 (Doc. # 35).

## III. STANDARD OF REVIEW

Pursuant to clear precedent in this circuit, summary judgment is entered only when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the non-moving party. *See Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party and in favor of the non-moving party. *See Hayden v. First Nat'l Bank of Mt. Pleasant,* 595 F.2d 994 (5th Cir.1979). Material factual disputes preclude summary judgment.

The Eleventh Circuit Court of Appeals has held that the moving party bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which that party believes show an absence of any genuine issue

Since the loss of Sam Walton, the management philosophies and employment conditions have changed drastically throughout WalMart. In the past the conditions that exist today would not have been tolerated and experiences like mine would never have been allowed to continue. I am a 13 year senior employee at 424 yet I feel no longer welcome at this store.
My last day of employment will be 4-28-95 thus ending a career at WalMart that until recently had been fulfilling and rewarding.

**45.** Johnson's EEOC charge states the following: "On or about May 26, 1994, I refused sexual advances by my supervisor, store manager,

David Jordan. Since that time, I have been continually harassed by comments about my appearance, my job has been threatened, I have been demoted from a management position to a department head, and my work schedule has been altered as a result of my refusal of Mr. Jordan."

**46.** This case was initially assigned to District Judge Ira DeMent, and on 20 March 1997, the parties consented to trial before a Magistrate Judge.

of material fact. *See Hairston v. Gainesville Sun Publishing,* 9 F.3d 913, 918 (11th Cir. 1993). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606 (11th Cir.1991). "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Ruling on a motion for summary judgment, a court "must evaluate the evidence in light of the proper standard of proof." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987).

## IV.  DISCUSSION

### A.  Timeliness  Of  Johnson's  EEOC Charge.

Before addressing the merits of Johnson's Title VII sexual harassment claims, the court must first consider the extent to which these claims are timely. Wal–Mart argues that Johnson did not file a timely charge with the EEOC. Johnson contends that the charge was filed well within the 180–day time period.

■ Title VII requires a plaintiff to file a charge with the Equal Employment Opportunity Commission within 180 days of the al-

---

47. Wal–Mart, on the other hand, incorrectly contends that the charge was filed on 24 March 1995.

48. The court's Uniform Scheduling Order which was issued on 11 April 1996 clearly indicates

leged discriminatory act(s). 42 U.S.C. § 2000e–5. The failure to file charges with the EEOC within the 180–day time period results in a bar of claims contained in the untimely filed charge. *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 662 (11th Cir. 1993).

Notwithstanding the general rule stated in *Ross,* equitable principles may forestall its strict application. In *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Supreme Court held that:

> ... filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.

455 U.S. at 392, 102 S.Ct. at 1131.

■ Here, Wal–Mart specifically denies that the plaintiff timely filed a charge with the EEOC. Therefore, the plaintiff bears the burden of proving compliance with the preconditions. *Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1010 (11th Cir.1982). In her charge of discrimination and in her memorandum, Johnson argues that the last incident of sexual harassment occurred on 13 February 1995 and therefore her charge, which was filed on 14 March 1995, is timely.[47] Pf.'s Opp. Mem., p. 22.

Johnson did not describe the conduct which allegedly occurred on February 13th, nor can the court discern the nature of the conduct from her submissions.[48] However, her deposition testimony includes the following:

> Q.  What happened to you on February 13th, 1995? That was the date of the investigation, wasn't it?
>
> A.  Yes, sir.

---

that discussions of the evidence in briefs "must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document."

Q. What happened to you on February 13th, 1995?

A. That was the day I reported the incident.

Q. Well, how were you retaliated against on February 13th, 1995 for reporting the incident?

A. It was the same as every other day. David continued the harassment. It was every day.

Q. On February 13th, 1995 while the investigation was going on you were being interviewed and everybody else at the store was being interviewed?

A. Yes.

Q. David Jordan was harassing you?

A. That morning before the interview, yes.

Q. What did he do that morning?

A. It was the same. You look nice this morning, I like your hair.

Johnson Dep. at 114–115.

■ Johnson's charge indicates that it was filed with the EEOC on 14 March 1995, the 29th day after the most recent incident of sexual harassment. Thus, there is evidence in the record indicating that Johnson's claims of sexual harassment fall within the 180–day time period. Accordingly, summary judgment cannot be predicated on this ground.

**B. Sexual Harassment Based Upon Hostile Environment**

■ A *prima facie* case of hostile work environment sexual harassment must include the following elements: (1) membership in a protected group; (2) subjection to unwelcome sexual harassment; (3) harassment based on sex; (4) harassment which affects a term, condition, or privilege of employment, in that it was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment; and (5) proof that the company knew or should have known of the harassment and failed to take remedial action. *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987).

Wal–Mart alleges that the conduct about which Johnson complains is not sufficiently severe or pervasive. Specifically, Wal–Mart contends that the Shoney's Inn incident—which is the only incident it considers to constitute potentially actionable sexual harassment—happened only once and therefore is an isolated incident. With respect to the comments about Johnson's appearance and the November, 1994 incident, Wal–Mart contends that they do not constitute actionable sexual harassment.

■ Whether the challenged conduct rises to a level sufficient to create a hostile work environment is a legal question that a court may address on summary judgment motion. *Stacy v. Shoney's Inc.*, 955 F.Supp. 751, 755 (E.D.Ky.1997); *Blankenship v. Parke Care Centers, Inc.*, 913 F.Supp. 1045, 1051 (S.D.Ohio 1995). As one court declared:

> The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women.... It is not designed to purge the workplace of vulgarity. Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Baskerville v. Culligan International Co.*, 50 F.3d 428, 430–431 (7th Cir.1995) (citations omitted).

■ The fourth element requires a showing that the harassment in its totality is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift*

*Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). This assessment should include consideration of the totality of the circumstances, including, but not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 22, 114 S.Ct. at 371.

■ This fourth factor has both an objective and subjective component. To be actionable, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find

hostile or abusive," and the victim must "subjectively perceive the environment to be abusive." *Id.* 510 U.S. at 19, 114 S.Ct. at 370.

■ The court finds that Jordan's conduct, in addition to being immature, inappropriate, and boorish, gave rise to a claim of sexual harassment based on a hostile environment. In so finding, the court is not unmindful of the several courts which have found similar conduct—and arguably more offensive conduct—to have been unoffensive and non-actionable under Title VII.[49] Jordan's conduct during the Shoney's Inn incident was continuous, unwelcomed and based on Johnson's gender.

This court also finds that Jordan's behavior constituted sexually offensive conduct

---

**49.** *See e.g. Baskerville, supra,* 50 F.3d 428 (7th Cir.1995) (held the following did not constitute sexual harassment: supervisor called the plaintiff "pretty girl", made grunting sounds like "um-um" when plaintiff wore a leather skirt, stated "all pretty girls run around naked", and stated that "with so many pretty girls", he "didn't want to lose control"); *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705 (7th Cir.1995) (held supervisor who stroked plaintiff's leg on one occasion, grabbed her buttocks on a separate occasion, told her that he found her attractive, and twice asked her out on dates, did not commit acts which were actionable); *Weiss v. Coca–Cola Bottling Co. of Chicago* 990 F.2d 333, 337 (7th Cir.1993) (held actions of supervisor unactionable even though he called subordinate "dumb blond", placed "I love you" signs in her work area, asked her for a date, put his hands on her shoulder, and tried to kiss her); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir. 1993) (held the following acts did not constitute sexual harassment: supervisor made inappropriate remarks, kissed and repeatedly touched the plaintiff, and chased her around a forest preserve); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986) (Sixth Circuit did not find actionable sexual harassment where (1) male supervisor referred to a female manager as "whore," "cunt," "pussy," and "tits" and stated "all that bitch needs is a good lay," and (2) the Company forced her to sit with female hourly employees during meetings, forbid her taking clients to lunch, and tolerated posters of scantily clad women in work areas); *Stoeckel v. Envtl. Management Sys., Inc.,* 882 F.Supp. 1106 (D.D.C. 1995) (held employee's attempts to kiss plaintiff, his lewd remarks about her appearance, his following plaintiff around the office, his unsolicited neckrubs, and hand-holding did not rise to the level of severity and pervasiveness); *Gearhart v. Eye Care Centers of America, Inc.,* 888 F.Supp.

814, 825 (S.D.Tex.1995) (held unactionable supervisor's conduct although supervisor touched plaintiff's breast and hair, kicked her in the buttocks, and made numerous lewd remarks directed at plaintiff); *Lefevre v. Design Professionals Ins.,* No. C–93–20720–RPA, 1994 WL 514020 (N.D.Cal. Sept.15, 1994) (supervisor's repeated handshakes and hugs at business meetings and references to plaintiff as "babe" did not create an objectively hostile work environment); *Ballou v. University of Kans. Med. Ctr.,* 871 F.Supp. 1384 (D.Kan.1994) (held defendant's actions did not constitute sexual harassment where supervisor defendant asked plaintiff about her interest in a romantic relationship, asked her to kiss him on her birthday, often stared at her and followed her); *see also Sapp v. City of Warner Robins,* 655 F.Supp. 1043, 1049 (M.D.Ga.1987) (police captain's "single effort to get the plaintiff [a female police officer] to go out with him was not of a repeated or continuous nature to be sufficiently pervasive enough to affect her psychological well-being"); *Neville v. Taft Broadcasting Company,* No. Civ–82–622C, 1987 WL 9638 (W.D.N.Y. January 16, 1987), *aff'd by,* 857 F.2d 1461 (2nd Cir.1987) ("Although the behavior which could rise to the level of sexual harassment cannot be precisely defined, it is clearly more abusive than what plaintiff alleges"—one incident in which her supervisor grabbed her, kissed her against her will and suggested that she would "go a long way" if she did "everything right"); *Freedman v. American Standard, Inc.,* No. Civ A 83–2126, 1986 WL 7825 (D.N.J. July 11, 1986), *aff'd by,* 833 F.2d 304 (3rd Cir.1987) (male pilot's attempt to touch and kiss female co-pilot on two occasions did not create sexually hostile environment); *Wimberly v. Shoney's, Inc.,* No. CV–585–098, 1985 WL 5410 (S.D.Ga. Sept.19, 1985) (several random incidents of sexually-related touching and comments by male manager did not create sexually hostile environment).

that is pervasive and that affects a term or condition of employment. At Shoney's Inn, Jordan's comments may be construed an insinuation that Johnson should submit to his sexual advances in order to keep—or at least protect—her job. His reference to having "save[d] her butt" is clear in its import. Similarly, his initial attempts to fondle, kiss, and hug her were the analytical bedrock of his later—and constant—comments about her physical appearance and dress.

■ When combined with the complaints about Jordan from other women[50] and Jordan's abrupt departure when told that he would be fired if the allegations were found to be true, those unrelenting comments about Johnson's physical appearance must be viewed from the perspective of a sexual harasser. Johnson has not alleged that she was psychologically depressed or that she required treatment as a result of Jordan's treatment of her. However, a plaintiff's work "environment does not have to be so severe as to cause a 'nervous breakdown' or 'seriously affect employees' psychological well-being". *See Splunge v. Shoney's Inc.,* 874 F.Supp. 1258, 1272 (M.D.Ala.1994), quoting *Harris,* 510 U.S. at 19–21, 114 S.Ct. at 370–371. Thus, the totality of the circumstances indicate that the incidents were sufficiently severe to create a hostile working environment and to alter the conditions of Johnson's employment.

In the instant case, the acts in question include: (1) the Shoney's Inn incident, (2) the November, 1994 incident, (3) Jordan's physical grabbing of Johnson during their discussion of her new position, and (4) Jordan's daily comments about Johnson's appearance, which, though arguably mild, were nevertheless designed to advance the purposes and perpetuate the effects of the initial offensive acts. These actions took place over a nine month period of time—*i.e.,* from May, 1994 to February, 1995.[51] Upon evaluation of the testimony and the evidence submitted, the court finds that these incidents, taken in the context of all the facts and circumstances presented, were sufficiently pervasive and severe to constitute a hostile work environment.

■ The plaintiff is unable to satisfy the fourth element of proof, however. The evidence, even when taken in the light most favorably to the plaintiff, still fails to establish that the employer—Wal–Mart—knew or should have known of the harassment and failed to take remedial action. While it cannot be disputed that Jordan was acting beyond the scope of his employment, upon a review of the evidence, it is equally indisputable that he was unaided by the employer. Thus there is insufficient evidence upon which to premise a finding that Wal–Mart is directly or indirectly liable for the harassment. *See Faragher v. City of Boca Raton,* 111 F.3d 1530 (11th Cir.1997).

■ "Corporate liability ... exists only through respondent [sic] superior". *Splunge v. Shoney's Inc.,* 874 F.Supp. at 1272. First, the plaintiff did not complain to Wal–Mart or its management about the Shoney's Inn incident, the November, 1994 incident, or the continuing comments which Jordan made about her appearance. There is evidence that she told some of her co-employees at the time, but that is insufficient to demonstrate that the employer should have been aware of the incidents or of those reports.

On 5 January 1995, in response to her questions, the plaintiff reported the harassment to Marsha Siler, a manager who was arguably Johnson's peer in the Wal–Mart

---

50. These complaints are perhaps more critical in this case, given the undisputed evidence that Johnson did not disclose Jordan's conduct to the other women who complained on their own. The court must conclude that their complaints arose from conduct entirely independent of Johnson's disclosures.

51. Construing the facts in the light most favorable to the plaintiffs, the court finds that Johnson complained to Siler in January, 1995. Siler was the manager of the deli department at that time and was considered a member of Wal–Mart management. Banworth Dep. at 90. Therefore, for purposes of this motion, Wal–Mart was on notice of Johnson's complaints at that time.

hierarchy. Siler then contacted Joe Tapper, a regional vice-president at Wal–Mart. Shortly thereafter, Tapper dispatched another Wal–Mart employee to the store to investigate the allegations against Jordan. It was during that investigation in February, 1995, but only as the result of another employee's suggestion, that the plaintiff's problems were specifically illuminated and addressed. Within a week, Jordan had resigned.

In this case, once on notice, the employer took "prompt and appropriate remedial action" to respond to the complaints. *Sparks v. Regional Medical Center Bd.*, 792 F.Supp. 735, 744 (N.D.Ala.1992). Summary judgment is thus appropriate on the plaintiff's hostile environment claim.

### C. *Quid Pro Quo* Sexual Harassment

Wal–Mart argues that Johnson cannot establish *quid pro quo* sexual harassment because there is no evidence that Jordan ever demanded sexual favors from her or that he threatened to take adverse action against her for rebuffing his advances. Wal–Mart also contends that Johnson's own testimony indicates that a tangible aspect of her employment was not adversely affected by her alleged refusal to comply with Jordan's sexual advances.[52]

■ To establish a *prima facie* case for *quid pro quo* harassment, a plaintiff must show: (1) membership in a protected group; (2) subjection to unwelcome advances or requests for sexual favors; (3) harassment based on sex; and (4) that submission to the unwelcome advances was an express or implied condition for receiving a job benefit or avoiding a job detriment. *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982).

In the typical *quid pro quo* sexual harassment case, the alleged harasser generally has intertwined a discussion of job benefits and

requests for sexual favors in a single conversation. Here, Johnson bases her claim of *quid pro quo* sexual harassment on the following facts, the details of which the court accepts as true for the purposes of deciding this motion: (1) the Shoney's Inn and the November, 1994 incidents; (2) Jordan's comment that he "saved her butt on the gun deal"; and (3) Jordan's frequent comments about her appearance. Regarding the Shoney's Inn incident, Johnson admits that Jordan never asked her to have sex with him. Johnson Dep. at 75–80. In fact, there is no evidence in the record that Jordan directly requested sexual favors for advancement or for continued employment.

In *McCoy v. Macon Water Authority*, 966 F.Supp. 1209 (M.D.Ga. 1997), the plaintiff testified that his supervisor, Charles Birkencamper, denied him an opportunity to attend a training seminar in Augusta because Birkencamper wanted instead to have him attend a seminar at Jekyll Island, so that Birkencamper could see him in a bikini bathing suit. The court stated that even if the allegation was true, it did not state a claim of *quid pro quo* harassment:

> Plaintiff does not allege that his wearing a bikini or attending the Jekyll Island seminar was made a condition of his going to Augusta, or that he was not permitted to go to Augusta because he had refused to submit to sexual advances. **Plaintiff does not allege that Birkencamper at any time asked for any sexual consideration; in other words, there is no allegation that Birkencamper offered any employment quid in exchange for a sexual quo.** The Jekyll Island allegation is simply another aspect of Plaintiff's hostile environment claim.

*Id.* at 1217 [emphasis added].

Similarly, in *Clark v. Johnson Controls World Services, Inc.,* 939 F.Supp. 884

---

**52.** While the court finds it unnecessary to consider this argument, the court notes that other courts have found similar arguments unpersuasive. *See Fowler, infra (citing Mills v. Amoco Performance Prod., Inc.,* 872 F.Supp. 975, 989 (S.D.Ga.1994) (*prima facie* case of *quid pro* quo

harassment not necessarily precluded where employee received benefit supervisor offered employee—avoiding an undesirable cleaning assignment—even though employee did not have sex with supervisor as requested)).

(S.D.Ga.1996), the court found that no evidence indicated that *quid pro quo* harassment had taken place. The court stated:

> Clark has admitted that she was never threatened or disciplined while she worked at the fire station. (Clark Depo. p. 110–111). Clark, also agrees that Jacobs did not use his position to affect adversely any of the terms or conditions of her employment and that his motivation for touching her was solely personal. Under the facts of this case, the Court has little trouble in concluding that Clark was not a victim of quid pro quo sexual harassment. Not one shred of evidence showing that Jacobs demanded any sort of sexual relations in return for job benefits or penalties has been presented.

*Id.* at 889. *See also Sneed v. Montgomery Housing Authority,* 956 F.Supp. 982, 986 fn. 3 (M.D.Ala.1997) (Carroll, J.) (court noted that there were no facts which suggest "quid pro quo" sexual harassment since "[t]he plaintiff, for example, [did] not complain that Brown threatened her with adverse employment action if she did not succumb to her advances").

As in *McCoy, Clark* and *Sneed,* Johnson has presented no facts which demonstrate that Jordan expressly conditioned her continued employment on her willingness to comply with his demands. However, the court's inquiry does not end here. This court believes that "without intertwining a discussion of job benefits and sexual favors in a single conversation, a creative supervisor can convey the message to a subordinate employee that the employee's career advancement and job benefits are conditioned upon the employee's

response to the supervisor's sexual advances." *Fowler v. Sunrise Carpet Industries, Inc.,* 911 F.Supp. 1560, 1578 (N.D.Ga. 1996). Thus, the court will consider if the plaintiff has alleged implicit *quid pro quo* sexual harassment.[53]

In *Fowler,* the court held "that where a supervisor discusses potential job benefits or detriments with a subordinate employee, during the same time period that the supervisor is making sexual advances on the employee, a reasonable jury may find the supervisor implicitly conditioned the subordinate employee's receipt of job benefits on the employee's acceptance or tolerance of the supervisor's sexual advances." *Id.* According to the *Fowler* court, "[a]t least three factors are relevant in deciding whether a claim for implicit quid pro quo harassment exists: (1) the frequency of the supervisor's sexual advances; (2) the length of time over which those advances occur; and (3) the tightness of the verbal/temporal nexus between the supervisor's sexual advances and the supervisor's discussion of job benefits or detriments." *Id.*

Johnson alleges that the Shoney's Inn incident occurred on 27 May 1994 and that on 30 May 1994, Jordan made the comment that he had "saved [her] butt on the gun deal." She further alleges that in November, 1994, while discussing the elimination of her job, Jordan grabbed her and that throughout this time period he made comments about her appearance. The evidence clearly establishes, however, that, although Jordan's position was abolished, she was immediately placed in an equivalent position

---

53. This court concurs with the reasoning expressed by the Ninth Circuit in *Nichols v. Frank,* 42 F.3d 503 (9th Cir.1994), where the court stated that:

> Implicit quid pro quo harassment is a most serious matter. It is far more likely to take place than is the explicit variety. As time goes by and harassers learn that they can no longer victimize their prey at will, their actions become less overt. In Hollywood, for example, the casting couch has been replaced by more subtle techniques. Yet for the potential employee, the result is still the same.

> The parallel with racial discrimination is obvious. Landlords offering apartments for rent no longer post notices saying "Whites Only." Instead, they will tell African–Americans and other minorities that the apartment has already been rented. Employers who do not wish to hire minorities no longer announce that such is their policy. They now cover up their misdeeds and offer false explanations for their employment misconduct. So, too, with the sexual harasser.

> *Id.* at 512.

with no loss in pay or other benefits. There is no further evidence of any loss or curtailment of any specific job benefit. Thus, there is not a clear nexus between Jordan's discussion of work-related matters and any request for sex,[54] and summary judgment on this claim is appropriate.

## D. Constructive Discharge

Wal–Mart contends that Johnson's constructive discharge claim has no basis in fact. Johnson, on the other hand, argues that she grew tired of working in a hostile atmosphere and suggests that the court should follow the decision of the state unemployment compensation agency.[55]

The law in this circuit with respect to constructive discharge is well-established. To show constructive discharge, the employee must prove that her working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. *Hill v. Winn–Dixie*, 934 F.2d 1518, 1527 (11th Cir.1991). As a prerequisite to a finding of constructive discharge, the Eleventh Circuit has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of "intolerable." *Id.* (citations omitted). A reasonable employee is one who does not "assume the worst" or "jump to conclusions too fast." *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). If the intolerable working conditions are the result of a hostile work environment caused by sexual harassment, then the constructive discharge

violates Title VII. *Henson, supra,* 682 F.2d at 907.

Wal–Mart contends that Jordan, the alleged harasser, resigned nearly three months (actually closer to two months) prior to Johnson's resignation. Johnson Dep. at 114–117. In her deposition, Johnson stated that there was nothing Wal–Mart should have done to address her complaints of harassment which it did not do. *Id.* at 72, 106. Thus, the alleged harassment stopped when Jordan resigned in February, 1995—nearly two months before Johnson's April, 1995 resignation.[56]

The Fifth Circuit addressed a similar issue in *Landgraf v. USI Film Products,* 968 F.2d 427 (5th Cir.1992), *cert. granted in part by,* 507 U.S. 908, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), *aff'd. by,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), where the district court found that, particularly in light of the corrective actions taken by USI immediately before the plaintiff resigned, the level of harassment was insufficient to support a finding of constructive discharge. The Fifth Circuit agreed with the lower court's conclusion and stated that:

> To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1077 (5th Cir.1981) (constructive discharge requires "aggravating factors"). The harassment here, while substantial, did not rise to the level of severity neces-

---

**54.** In contrast, see the following cases where the courts found implicit *quid pro quo* sexual harassment: *Nichols, supra* ("Nichols asked for a two-week leave of absence. Before granting her request, Francisco requested that she perform oral sex on him. She did so unwillingly. Immediately following the act, he granted her leave"); *Wilson v. Wayne County,* 856 F.Supp. 1254, 1260 (M.D.Tenn.1994), *remanded on other grounds by,* 69 F.3d 538 (6th Cir.1995) ("Only a few days before the events of July 13, Ms. Wilson had asked Sheriff Nutt if she could stay on as a dispatcher in the fall, and he responded that he would 'think about it.' Minutes after she raised the issue again, the sheriff called her into his office for sex").

**55.** While the record before this court does contain a fact finding report from the Department of Industrial Relations' Unemployment Compensation Agency, the ultimate decision of that agency was not provided.

**56.** On the initial claim form submitted to the Alabama Department of Industrial Relations, Johnson indicated that she notified Banworth about the harassment after which Jordan resigned and the harassment stopped. Johnson Dep., Exhibit 10, p. 2.

sary for constructive discharge. Although USI's investigation of this incident may not have been overly sensitive to Landgraf's state of mind, the company had taken steps to alleviate the situation and told Landgraf to let them know of any further problems. A reasonable employee would not have felt compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment. We cannot say that the district court clearly erred in rejecting the claim of constructive discharge.

*Id.* at 430–431. *See also Spence v. Maryland Casualty Co.,* 995 F.2d 1147 (2nd Cir.1993) (no constructive discharge where harassment of which employee complained had ceased several months before he stopped working, and employer had informed employee that he would not have to report to the harassers again); *Saxton v. American Telephone & Telegraph Co., supra,* 10 F.3d at 537 ("Of course, once [the alleged harasser] was gone, any behavior that might arguably have rendered Saxton's work environment intolerable was terminated"); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989) (female employees failed to establish that they were constructively discharged as a result of company vice-president's sexual harassment consisting of sexually oriented joking and innuendo; the evidence supported a finding that the officer's harassment stopped after he was reprimanded by officials of the parent corporation several weeks before the female employees resigned).

■ The court concludes that where, as here, the alleged harassment ceases over two months before the plaintiff's resignation, the plaintiff's claim of constructive discharge is not a reasonable one.[57] Yet, the court's inquiry does not end here. Johnson's brief indicates that after she reported Jordan's conduct and after store management re-

ceived notice of her EEOC charge, "her treatment at the store changed." "She was asked to work nights", "was verbally reprimanded when she refused," "[h]er job performance was constantly criticized, and she was given an unreasonable amount of work to complete in each day." "In spite of repeated requests for assistance, she was given none" and "she was called a traitor by co-employees." Pf.'s Brf., p. 17.

■ These allegations do not advance Johnson's constructive discharge claim. First, although Johnson testified that her supervisor, Keith Grund, asked her to work two nights a week commencing in February, 1995, Johnson admitted that other department managers were similarly asked to work the same night shift twice a week. Johnson Dep. at 94–99. Moreover, Johnson refused to provide the company with the names of the employees who allegedly dubbed her a "traitor". Johnson Dep., Exhibit 10, pp. 3–4. "Title VII does not require fellow employees to like each other." *McCoy v. Macon Water Authority, supra,* 966 F. Supp. at 1220.

With respect to the allegation of constant criticism, Johnson testified that Stansberry and Grund gave her "notes" which were written work directives given to managers by their supervisor. Johnson admits, however, that other department managers also received these notes. Johnson Dep. at 88–89. Of further significance is that she testified about these notes in connection with a single incident involving "eight pallets stacked full of boxed makeup" which her managers wanted placed on the store shelves. *Id.* at 89. Johnson failed to provide evidence of any other disciplinary treatment she received which supposedly forced her to tender her resignation.

Johnson's husband testified that he told her to quit "way prior to her quitting," possibly as early as December, 1994 and that

---

57. On the initial claim form submitted to the Alabama Department of Industrial Relations, Johnson indicated that she quit because, although the harassment stopped, other employees continued to harass her. Johnson Dep., Exhibit

10, p. 2. On page four of the form, Johnson wrote that "after his resignation, I was also harassed by other employees at the store because I filed a lawsuit."

Johnson waited to leave in April in order to accrue her profit sharing benefits for 1995. A. Johnson Dep. at 27–32. That Johnson was able to wait until April of 1995 to resign and then to give Wal–Mart three weeks notice before leaving her position strongly suggests that the conditions to which she allegedly were subjected were not intolerable. The court is also mindful of the fact that, notwithstanding Johnson's claims regarding the severity of the harassment, she did not initiate a report; instead, another employee directed Wal–Mart's attention to her during the course of a separate investigation of another's complaint. For these reasons, Johnson's constructive discharge claim cannot prevail.

### E. Retaliation

Wal–Mart also contends that summary judgment is appropriate for Johnson's claim of retaliatory treatment. Specifically, Wal–Mart contends that Johnson cannot establish that she suffered an adverse employment action or that there is a causal connection between her protected activities and the adverse employment action. The court agrees.

▮ A plaintiff alleging a retaliation claim under Title VII must begin by establishing a *prima facie* case. The plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir.1995) (per curiam).

▮ *Perryman v. West*, 949 F.Supp. 815 (M.D.Ala.1996), addresses the meaning of "adverse employment action" and notes that "[t]he Eleventh Circuit has not conclusively

determined whether or not harassment can constitute an adverse employment action." *Id.* at 819. The court in *Perryman* interprets the Eleventh Circuit's holding in *Jordan v. Wilson*, 851 F.2d 1290 (11th Cir.1988), to imply that the harassment must affect a term or condition of employment in order to constitute actionable retaliation. "In other words, an employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it." *Id.* at 819.

The plaintiff in *Perryman* alleged that her employer investigated her for possible forgery of worker's compensation claims in retaliation for her EEOC complaints. The court held that the investigation was not an adverse employment action because the plaintiff did not show that her future employment had been affected or that her ability to do her job had been impaired. The court finds the reasoning of *Perryman* persuasive and its holding reasonable and adopts its "term or condition" analysis.

In her opposition memorandum, Johnson alleges that the conduct which resulted in her constructive discharge also was in retaliation for reporting Jordan's conduct and for filing a charge with the EEOC. Pf.'s Brf., p. 17–18. Yet, only her claims of constant criticism and insufficient personnel could possibly have affected her future employment and her ability to perform her responsibilities.[58]

Even if the court deemed those events to have constituted adverse employment actions, there is no evidence of a causal connection between them and Johnson's protected activity. The notes from Stansberry and Grund about the makeup inventory occurred in January, 1995—one month prior to her complaint to Banworth and two months prior to the filing of her EEOC charge. Summary

---

**58.** *See McCoy, supra* (court found that the plaintiff's retaliation complaints, taken together, did not add up to an adverse employment action which would affect his ability to do his work or hamper future employment opportunities; the plaintiff claimed that the following conduct was retaliatory: (1) he was ordered to report to another supervisor in the afternoon rather than to

the alleged harasser, whose office was across the street, (2) he was watched, (3) his desk was searched, (4) other employees treated him like he had a disease, (5) his work schedule was impossible to meet and he was never able to comply with it fully, and (6) he was subjected to a hostile meeting with a supervisor).

judgment on the constructive discharge claim is appropriate.

## F. The Tort Of Outrage

In Alabama, the tort of outrage applies only "in the most egregious circumstances." *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir.1996) (*citing Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993)). The conduct complained of must be "so outrageous as to be regarded as atrocious and utterly intolerable in a civilized society." *Kilgore, supra* (*citing American Rd. Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980)).

To establish the tort of outrage, the plaintiff must prove three elements: "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the distress was severe." *Moore v. Spiller Associated Furniture, Inc.*, 598 So.2d 835 (Ala.1992) (*quoting Perkins v. Dean*, 570 So.2d 1217, 1219 (Ala.1990)). The Supreme Court of Alabama summarized the exceedingly narrow scope of the tort as follows:

> [T]he tort of outrage is a very limited cause of action that is available only in the most egregious circumstances. As a consequence, this court has held in a large majority of the outrage cases reviewed that no jury question was presented ... In fact, in the 12 years since *Inmon* was decided, all cases in which this court has

found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials ... 2) a case where insurance agents employed heavy handed, barbaric means in attempting to coerce the insured into settling an insurance claim ... 3) a case involving egregious sexual harassment. (emphasis added).

*Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993).

The Alabama Supreme Court has suggested that limited forms of sexual harassment do constitute outrage. *Brewer v. Petroleum Suppliers, Inc.*, 946 F.Supp. 926, 935 (N.D.Ala.1996). However, "[m]ere requests for sexual favors are not sufficient." *Brewer, supra* (*citing McIsaac v. WZEW–FM Corp.*, 495 So.2d 649, 651 (Ala.1986)).[59] "Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient." *Id.*

"However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties. An employee can decline even the most obscene request to be touched in a sexual manner. An employee cannot decline a physical act that has already occurred. At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society." *Brewer* (*citing Busby*, 551 So.2d at 324).

---

59. *See e.g. Brassfield v. Jack McLendon Furniture, Inc.*, 953 F.Supp. 1438 (M.D.Ala.1996) (male manager's conduct was not extreme and outrageous as required to support outrage claim under Alabama law; manager told female employee that females were lesser persons than males, pointed his finger at female employee and pretended to "blow her away," stated that any woman wearing panties could leave work early, asked employee whether "P" on her necklace stood for "prostitute," asked another female employee whether she wore panties, called employee "stupid bitch" on several occasions and told employee he would fill her orders "when he was good and damn ready"; other male manager's conduct also was not extreme and outrageous as required to support outrage claim under Alabama law; manager commented that he ate chicken breasts that reminded him of female employee, joked about nude portrait that employee brought to work, speculated about which female employee would last longest at work, and speculated about employee's sex life with other sales persons; other defendant's conduct was not extreme and outrageous as required to support outrage claim under Alabama law; manager commented that he did not like women and that he was going to be sure that female employee did not remain at work, threatened employee with clenched fist while stating "If I hear one more word out of you, girl, I'm going to slap your teeth out of your head;" and claimed, in front of customers and sales persons, that employee had stolen one of manager's customers).

Johnson cites no case—nor has the court found one upon independent review in which the Alabama Supreme Court has held that the type of sexual harassment alleged in this case constitutes outrageous conduct. In contrast, the court has held "that several requests by an employer for a female employee to have dinner with him, to kiss him, or to have an affair with him would not support a claim for outrageous conduct." *Busby, infra.*[60]

In *Brewer, supra,* the plaintiff alleged that her supervisor pinched her buttocks, touched her breasts, expressed a desire to have sex with her if she were ever unconscious, expressed a desire to expose himself to her, pressed against her and so forth. The court denied the defendant's motion for summary judgment and concluded that "[i]f the plaintiff's allegations are true, [her supervisor] has not simply requested or threatened to touch the plaintiff in a. sexual manner, he has repeatedly touched her. As such, his actions may constitute outrageous conduct." 946 F.Supp. at 936. Such egregious conduct is not present in this case.

■ The facts of this case are similar to those presented in *Cabaniss v. Coosa Valley Medical Center,* No. cv–93–PT–2710–E, 1995 WL 241937 (N.D.Ala. March. 20, 1995), *aff'd. by,* 116 F.3d 491, (11th Cir. 1997) (Table No. 95–6253). There, the plaintiff alleged several instances where she was yelled at and told that she was "stupid", "brain dead" and a "dumb ass". On one occasion, she claimed that the alleged harasser physically moved her from where she was working and told her to go and stand in a corner. The court concluded that the evidence did not rise to the required level of "indecency" or of being utterly intolerable in order to constitute outrage. *Id.* at * 29. Wal–Mart's request for summary judgment on the outrageous conduct claim will therefore be granted.

## G. Invasion Of Privacy

■ The court will next address Johnson's invasion of privacy claim. Alabama has accepted the definition of the Tort of Invasion of Privacy as set forth in *Prosser, The Law of Torts. See Cates v. Taylor,* 428 So.2d 637, 639 (Ala.1983). As analyzed in *Cates,* there are four acts which constitute an invasion of privacy in Alabama. These are: "(1) 'the intrusion upon the plaintiff's physical solitude or seclusion,' (2) 'publicity which violates the ordinary decencies,' (3) 'putting the plaintiff in a false but not necessarily defam-

---

**60.** In *Busby v. Truswal Systems Corp.,* 551 So.2d 322, 324 (Ala.1989), the Alabama Supreme Court held that a plant supervisor's extreme sexual harassment of his female employees created a jury question as to liability for the tort of outrage. In Busby, the court found that there was evidence of at least seventeen incidents of harassment. The court found there was evidence that the harasser (1) invited Busby and Money to swim in his pool in the nude with him; (2) told Busby his hands were cold and asked if he could put them in her pockets to keep them warm; (3) told the plaintiffs that he would "put a stick on their machines" so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiff's into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiff's one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs. *Id.* at 324. The court found that these actions, considered altogether, could constitute extreme and outrageous conduct. *Id.* Thus, the court considered 17 instances of egregious misconduct. The difference between the facts of that case and those here are so obvious as to not require discussion.

atory position in the public eye,' and (4) 'the appropriation of some element' of the plaintiff's personality for a commercial use." *See also Busby,* 551 So.2d at 323. Johnson is clearly proceeding under the first definition, "intrusion on seclusion."

In *Hogin v. Cottingham,* 533 So.2d 525 (Ala.1988), the Alabama Supreme Court elaborated on a wrongful intrusion claim:

> [T]here must be something in the nature of prying or intrusion and the intrusion must be something which would be offensive or objectionable to a reasonable person. The thing into which there is intrusion or prying must be, and be entitled to be, private. Two primary factors are considered in determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information.

*Id.* at 531 (citations and internal quotations omitted).

■ Using the *Hogin* court's analysis, the court in *Brassfield* found that comments about the plaintiff's dress, her breasts and a nude portrait which she brought to work, a request by the alleged harasser to sit in his lap and the alleged harasser's agreement with another McLendon employee who asked the plaintiff if she'd go skinny dipping did not constitute prying into the private matters of the plaintiff's life. Under the *Brassfield* court's analysis, the comments made by Jordan about Johnson's appearance were not actionable.

■ Therefore, Johnson's invasion of privacy claim may succeed only if the Shoney's Inn and the November, 1994 incidents of touching are sufficiently intrusive. Consistent with case law, the court finds that those incidents may be the basis of a privacy claim. *See e.g. Kelley v. Troy State Univ.,* 923 F.Supp. 1494, 1503 (M.D.Ala.1996) (denying motion to dismiss invasion of privacy claim where defendant: made sexually explicit remarks and jokes at the expense of women; made degrading personal comments to plain-

tiff, such as telling her she was having "a blond attack" when she made an error, and to "show a little leg" when a male colleague was coming to the office; and on several occasions, defendant struck plaintiff, either with an open hand or a closed fist).

The court is also persuaded by the ruling in *Cunningham v. Dabbs,* 703 So.2d 979 (Ala. Civ.App.1997). There, the court found that a genuine issue of material fact existed as to whether employer's sexual propositions and inappropriate physical contact with the employee unreasonably intruded into the employee's private affairs, precluding summary judgment on her claim of invasion of privacy. The plaintiff alleged that the individual defendant frequently rubbed her shoulders and repeatedly made lewd and suggestive comments to her, including suggestions that they have sex, that they should "slip off and go skinny-dipping," that he "[knew] of a better way of getting hot and sweaty that we could enjoy," that he would take her hunting and "we'll find more to do than just wait on a deer to come by," and that he told her "just because you sleep with someone does not mean you have to marry them". The plaintiff also alleged that while she was at lunch with a group from work, the defendant said that he would fire her if she got married again. On another occasion, he stuck his tongue in her ear.

■ Although the court determines that a reasonable jury might find that Jordan's behavior constituted an invasion of the plaintiff's privacy, the plaintiff has presented no evidence in support of Wal–Mart's liability on this issue. The plaintiff cannot impute knowledge or consent to her employer for any of Jordan's actions which occurred between May, 1994, and her confirmation of another employee's suspicions in February, 1995. By that time, Jordan's conduct was limited to comments—although "constant"— about the plaintiff's appearance. In *McIsaac, supra,* 495 So.2d at 652, the court determined that an employer's occasional touching of his employee and his repeated advances and propositions were not sufficient to rise to

the level of conduct required to constitute invasion of privacy. Thus, summary judgment will be granted on this claim.

## H. Interference With A Contractual Relationship

Wal–Mart also seeks summary judgment on Johnson's claim of intentional interference with contractual relations.

In *Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So.2d 1304 (Ala.1990), the Alabama Supreme Court stated the following elements which are necessary to establish a claim of intentional interference with contractual relations:

> (1) the existence of a contract or business relation;
>
> (2) defendant's knowledge of the contract or business relation;
>
> (3) intentional interference by the defendant with the contract or business relation; and
>
> (4) damage to the plaintiff as a result of the defendant's interference.

*Id.* at 1306 (*citing Lowder Realty, Inc. v. Odom*, 495 So.2d 23, 25 (Ala.1986)).

Wal-Mart claims that under Alabama law, an employer cannot "tortiously interfere" in the contractual or business relationship with its own employee. Wal–Mart relies upon *Hickman v. Winston County Hospital Board*, 508 So.2d 237, 238 (Ala.1987), for that principle. A more recent case, *Williams v. A.L. Williams & Assocs.*, 555 So.2d 121 (Ala. 1989), also held that a party to a business relationship cannot be held liable for interference with that relationship. Pursuant to *Williams*, Wal–Mart's summary judgment motion on this issue will be granted. *See Cabaniss, supra*, 1995 WL at *29 (where the court ruled similarly).

## I. Loss Of Consortium

■ Loss of consortium is a "derivative" tort which exists only if the defendant is also liable in tort to the spouse who is unable to provide consortium. Proof of the underlying tort is a necessary element of an action for loss of consortium. *Godby v. Electrolux Corp.*, Nos. 1:93–CV–0353–ODE, 1:93–CV–1260–ODE, 1993 WL 406047 *2 (N.D.Ga. August. 23, 1993). Because the court has found that Wal–Mart is not liable to Stephani Johnson under either Title VII or the state law torts, Anthony Johnson cannot recover.

## V. CONCLUSION

For the reasons discussed above, it is the ORDER, JUDGMENT and DECREE of this court that:

The motion for summary judgment filed by the defendant Wal–Mart Stores, Inc. on 3 December 1997 is GRANTED, and the plaintiffs' federal and state claims against Wal–Mart are DISMISSED with prejudice.